J.T. GIBBONS, INC.

v.

CRAWFORD FITTING COMPANY, INC., et al.

Civ. A. No. 79–1127.

United States District Court, E.D. Louisiana.

Dec. 23, 1981.

Joseph M. Alioto, Alioto & Alioto, San Francisco, Cal., for plaintiffs.

Ernest Mansour, Cleveland, Ohio, for defendant Fred A. Lennon.

Dando B. Cellini, McGlinchey, Stafford, Mintz & Cellini, New Orleans, La., for Crawford Fitting Co.

Thomas E. Balhoff, Baton Rouge, La., for Capital Valve & Fitting Co., Inc., and R.D. Jennings.

Charles E. Hamilton, New Orleans, La., for Thomas A. Read & Co., Inc.

PALMIERI, Senior District Judge.*

### PRELIMINARY STATEMENT

This antitrust action brought under sections 1 and 2 of the Sherman Act was tried

---

* Hon. Edmund L. Palmieri, Senior United States District Judge for the Southern District of New York, sitting by designation.

to a jury from November 2, 1981 to November 19, 1981. Both parties moved for directed verdicts at the close of the entire case. Defendants' motions were granted, plaintiff's were denied. Only a counterclaim of the defendants for damages based on a general tort statute of Louisiana [1] was submitted to the jury on special interrogatories and resulted in no award of damages. At the time the directed verdicts were granted, this court made an oral disposition of the motions on the record and committed itself to the filing of a more elaborate statement of its views after the close of the case. This opinion represents the fulfillment of that commitment.

The plaintiff, J.T. Gibbons, Inc. (Gibbons) of New Orleans, is principally an exporting company dealing in a great many domestically manufactured goods it resells throughout the world. Richard Keeney, its president, had been a salesman for one of the defendants, Capital Valve and Fitting Company, Inc. (Capital) of Baton Rouge from 1973 until 1975. Capital is the Louisiana distributor of the products of Crawford Fitting Company (Crawford), another defendant, which is a manufacturer of valves and tube fittings, and which has its principal place of business in Solon, Ohio. Crawford's products are sold through a network of independent distributors located throughout the United States and in numerous foreign countries. It is owned by Fred A. Lennon, its present chairman of the board and former president, a defendant in this case. Its current president is Francis J. Callahan. Capital is owned and operated by Mr. Robert D. Jennings, its president, who was joined as a defendant in this lawsuit. Thomas A. Read and Company (Read), a Texas corporation, another defendant in the case, was the authorized distributor for Crawford products in the greater Houston, Texas area.

In 1975, Mr. Cecil Keeney, a New Orleans businessman, purchased the Gibbons company for his two sons, Richard Keeney and Michael Keeney who became president and executive vice-president, respectively, of the company. Shortly hereafter, Richard Keeney had Gibbons commence the purchase of Crawford valves and fittings from Capital. The Crawford products were then resold by Gibbons in the North Sea oil drilling area. In May 1978, Capital refused to continue its business with Gibbons. In June 1978, Gibbons claimed it was the victim of a boycott and sought to buy products directly from Crawford. While it did not succeed in this, Crawford provided an alternate source of supply from its distributor in Birmingham, Alabama, Franklin Valve and Fitting Company, Inc. (Franklin). Gibbons never availed itself of Franklin or the blanket discount it offered, but Gibbons was never at a loss to fill its orders for Crawford products, having succeeded in using a Crawford distributor, Potomac Valve and Fitting Company (Potomac), in the Washington, D.C. area for this purpose. Gibbons also made purchases of valves and fittings from Crawford competitors. There was overwhelming evidence that the industry was intensely competitive and that Crawford's share of it was relatively small. Because Crawford's products required technical skill for their proper use and were frequently the component parts of installations having serious accident potentials, service follow-up procedures, engineering support and territorial restrictions were part of the distribution system. Gibbons has charged that it was damaged by this system in various ways and that the maintenance of the system was a restraint of trade and the result of a conspiracy to restrain trade in which Crawford, Capital, Read, Mr. Lennon, Mr. Callahan and Mr. Jennings participated. [2]

---

**1.** Article 2315 of the Louisiana Civil Code provides as follows:

> Art. 2315. Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.

Because defendants have filed motions dealing with the disposition of the counterclaim to which plaintiff has not yet responded, a separate forthcoming opinion will be required to dispose of this aspect of the case.

**2.** Plaintiff contends in its memorandum of fact and law that defendants engaged in eight Sherman Act offenses:

The various aspects of these charges will be dealt with separately.

## THE CRAWFORD COMPANIES

Fred A. Lennon began the Crawford business in 1947, entering an industry which already had many well established competitors. Crawford did not begin to manufacture valves until 1959, and has gradually added products to its valve lines over the years. Today, it sells over four thousand different valve and fitting products.

Crawford has five, separately incorporated, manufacturing companies which manufacture different products: Crawford Fitting Company (Swagelok tube fittings); Whitey Company (shut off and ball valves); Nupro Company (fine metering, bellows and check valves); Cajon Company (weld pipe fittings and vacuum products); and Sno-Trik Company (very high pressure products). Crawford products are sold wholesale to its distributors by regional warehouses. The three domestic warehouses relevant to this litigation are Southern Swagelok, Eastern Swagelok and Central Swagelok. These warehouses are also separately incorporated. Southern Swagelok serves Crawford's distributors in the southern part of the United States, including Capital in Baton Rouge, Franklin in Birmingham, and Read in Houston. Eastern Swagelok serves Crawford's distributors in the northeastern part of the United States, including Potomac, located in Rockville,

Maryland. Capital and Potomac are the two distributors from which Gibbons purchased Crawford's brands of valves and fittings.

Crawford also sells its products in Europe, through its warehouse in Switzerland, Microventil. Some of the distributors purchasing from Microventil, and involved in this case, are Glasgow Valve and Fitting, Aberdeen Valve and Fitting, and Stavanger Valve and Fitting.

At all times involved in this lawsuit, Fred A. Lennon has owned all or a controlling majority of the stock of Crawford Fitting Company and all of its affiliated manufacturing and warehousing companies. He has been chairman and a director of the board. Francis J. Callahan has been an officer and director of all manufacturing companies and warehouses. He is the minority shareholder of the only manufacturing company of which Mr. Lennon is not the sole shareholder. Mr. Callahan is married to Mr. Lennon's niece.

None of these manufacturing and warehousing companies own any of the shares of any other of these companies. Their product lines complement each other and are sold through the same distributors out of a common catalog. They do not compete with each other. Their product lines do not overlap and they are all controlled by Mr. Lennon.

A. Defendants have engaged in horizontal price fixing at the manufacturing level in violation of Section One of the Sherman Act.

B. Defendants have engaged in vertical price fixing from the manufacturing level to the regional wholesale level in violation of Section 1 of the Sherman Act.

C. Defendants have engaged in vertical price fixing from the manufacturing level to the local distribution level in violation of Section 1 of the Sherman Act.

D. Defendants have engaged in horizontal price fixing and market allocation at the local distribution level in violation of Section 1 of the Sherman Act.

E. Defendants have engaged in massive data dissemination in violation of Section 1 of the Sherman Act.

F. Defendants agreed to territorial market allocation by contract, to the exchange of current customer and price information, and to the payment of five percent on all out-of-territory sales, all in violation of Section 1 of the Sherman Act.

G. Defendants have engaged in a group boycott and concerted refusal to deal with plaintiff in violation of Section 1 of the Sherman Act.

H. Defendants have engaged in a conspiracy and attempt to monopolize in violation of Section 1 [sic] of the Sherman Act.

Mr. Callahan is alleged to have participated in the above offenses. He was not, however, named as a defendant in this lawsuit. Plaintiff also alleges the participation of Microventil, Crawford's European warehouse, and Glasgow Valve and Fitting, a European distributor of Crawford products, in the last claim, "H", listed above. Microventil and Glasgow are not defendants in this lawsuit.

For each of the product lines of the Crawford companies, there is a published suggested price list, a distributor discount schedule and a suggested customer discount schedule. The price lists and discount schedules suggested are set by Mr. Lennon and Mr. Callahan. The final decision concerning these matters is reserved for Mr. Lennon, who controls these companies.

Crawford warehouses acquire the Crawford products at cost plus a small percentage markup, of one-and-a-half (1½%) percent. These warehouses then sell Crawford products to distributors at a discount commensurate with the size of the distributor's order. A similar discount, or "blanket", system is used by distributors in selling their products to purchasers. Gibbons purchased from the distributors.

Crawford products are similarly sold throughout Europe, except that an additional markup of approximately ten (10%) percent is calculated for its European price list, to cover the cost of transportation and air freight packaging, a small Swiss duty, and other costs associated with the transatlantic passage of the product. Microventil pays for Crawford products in American dollars, but sells to distributors, keeps its accounts, and pays its employees in Swiss francs as it is located in Switzerland.

There is no evidence that Crawford has ever rebuked or disciplined a distributor for selling at the distributor's own price. The Crawford contract with its distributors contains a sixty-day termination clause, permitting either party to terminate the distributorship agreement on sixty days' notice.

## CRAWFORD'S DISTRIBUTION SYSTEM

A closer look at Crawford's methods in selling and distributing its products can provide a better understanding of the discussion which follows. Crawford created a system of exclusive Crawford distributorships throughout the United States, and later abroad. Each distributor was assigned a specific territory. The defendants Capital and Read were such distributors. Each distributor was obliged to maintain local stocks of Crawford products, service the needs of the customers in its territory and make personal calls on them. Since the maintenance of the local stocks engendered a considerable expenditure beyond the financial means of the distributor, the distributor would be permitted to acquire the products on credit on an open account. Crawford would typically take a minority ownership in the distributorship until it could become established and handle its own financing. The minority ownership would then be transferred at cost to the distributor. The distributorship would thereupon become one hundred percent independently owned. The vast majority of Crawford's distributors got their stock in this way and the same pattern is still being followed today.

As Crawford expanded into new product lines it developed increasingly customer-oriented marketing techniques emphasizing both the reliability and the availability of its products. The successful completion of programmed learning courses on fittings and valves was required of every prospective salesman in order to make them knowledgeable about how the products should be installed and used.

Another development was the creation of Crawford's five percent service commission program put into effect in 1973. It is of special significance in this lawsuit because of the emphasis placed upon it by the plaintiff as the basis for certain contentions made by it and which will be referred to in the discussion of plaintiff's section 1 claims. Because a significant part of the market for fittings and valves involved their use in large construction projects such as chemical plants, oil refineries, public utility plants and nuclear power plants, sale contacts would typically involve the territories of several Crawford distributors at the same time: the location of the architect and designer, the location of the new plant site and the location of the company financing the project. Crawford lacked a national sales office and therefore, it could not, like some of its competitors, coordinate its efforts at different locations for new con-

struction sales business. Crawford distributors would each seek to secure the business from the point of contact within its territory since it could not be sure where the decision to buy would be made. If the purchases were made at a place different from the plant site, the Crawford distributor servicing the territory in which the plant site was located would sometimes find himself without any commission but with a customer to service. In order to remedy this situation, the distributor making a sale for a shipment into a territory of another exclusive distributor was required to make out a check to Crawford for five percent of the invoice price and send it along with the invoice to Crawford. Crawford would then determine if the sale required servicing in the territory into which the products were shipped. If it so determined, Crawford made out a check for five percent of the invoice price to the distributor into whose territory the products were shipped, sending him the check along with the invoice setting forth the name and location of the customer. The service follow-up relationship would thereby be set in motion and an incentive would be provided for it.

Additionally, and because Crawford attached the greatest importance to the quality of its product as well as its prompt delivery to customers, it provided engineering support for them and required each distributor at all times to carry an adequate inventory. Distributors were also expected to conduct seminars, training meetings and conferences relating to sales, service and safety for its customers on a continuing and regularly scheduled basis. The ability to deliver in terms of quality and delivery time were essential aspects of the Crawford distribution system. In order to maintain control over quality and delivery time for its products, Crawford needed ready access to vital market information on a timely basis so that it could continuously monitor all phases of its operations and permit itself to react quickly to changing market conditions.

Many distributors, including Capital for whom Gibbons' president, Richard Keeney, had been an employee and from whom Mr. Keeney purchased Crawford products until 1978, do not provide their customers with full discounts or their salespeople with full commissions in those cases where they would be required to tender the five (5%) percent service commission check to Crawford. This policy is adopted by the distributors to ensure the profitability of sales out of their territories.

## DEFENDANTS' MOTIONS FOR A DIRECTED VERDICT

### A. DIRECTED VERDICT STANDARD

The directed verdict standard in the Fifth Circuit, as enunciated in *Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969), is as follows:

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment *might reach different conclusions,* the motions should be denied, and the case submitted to the jury. *A mere scintilla of evidence is insufficient to present a question for the jury ... There must be a conflict in substantial evidence to create a jury question.* (emphasis added)

Forensic eloquence cannot be a substitute for hard evidence. What evidence can be said to exist in this case in support of plaintiff's claims is insufficient to support them. Accordingly, this court is constrained to grant defendants' motion for a directed verdict against plaintiff on all Sherman Act sections 1 and 2 claims asserted by the plaintiff, and to deny plaintiff's motion for a directed verdict in its favor.

### B. MOTION FOR A DIRECTED VERDICT ON SECTION ONE CLAIMS

In order to recover damages for a violation of section 1 of the Sherman Act, plaintiff must prove

1) the existence of an agreement or conspiracy;

2) which unreasonably restrained trade; and

3) caused an injury to plaintiff.

Defendants have moved for a directed verdict on all section 1 claims alleged by plaintiff. Included in their motions, defendants cite plaintiff's failure to introduce evidence that it was injured by any action of defendants. Additionally, defendants have moved for a directed verdict on the ground that plaintiff failed to prove any unreasonable restraint of trade resulting from defendants' actions.

Conversely, plaintiff has moved for a directed verdict on its section 1 claims which allege *per se* violations of antitrust laws.

█ The defendants' motion for a directed verdict on plaintiff's section 1 claims is granted on the basis of a complete failure of proof by plaintiff on virtually every element alleged in every claim asserted. Furthermore, plaintiff's motion for a directed verdict is denied as no *per se* violation has been substantiated by the record.

There is insufficient proof with respect to all claims in the following respects: 1) failure of proof that plaintiff suffered an injury resulting from any action by defendants; and 2) failure of proof that any actions of defendants had an anticompetitive effect, as is required under the appropriate "rule of reason" analysis for the alleged offenses. Additionally, there is insufficient proof with respect to specific claims in the following respects: 1) lack of capacity of various Crawford officers and corporations to form a conspiracy; and 2) Gibbons' lack of standing to sue various defendants.

## NO PER SE VIOLATIONS

█ This court is convinced, after careful consideration of the cases cited by the parties and an examination of the evidence introduced at trial, that plaintiff has failed to offer sufficient evidence for submission to the jury of any claim of *per se* violation. This case involves the vertical distribution scheme of a manufacturer in a highly competitive industry, requiring highly skillful selling techniques, where the reliability of the product is an essential purchasing criterion and where service to customers and engineering support for the use of the product are concomitants of that reliability. Service ensures a means by which a manufacturer, such as Crawford, can guarantee to its customers that they will be using the proper product in the proper manner in industries in which an error can be extremely costly. This service also minimizes Crawford's exposure to the potential for liability which might ensue in costly products liability litigation. The evidence is overwhelming that service is a significant element in the valve and fitting industry generally.

In addition, a manufacturer such as Crawford has a clear interest in seeing its product sales increase. Since Crawford's vertical distribution scheme relies upon distributorships to accomplish both the objective of increasing sales and servicing its customers, it developed a geographic scheme which places limits on the sales of distributors outside their territories. Clearly, this aspect of Crawford's scheme would be subject to a "rule of reason" analysis under *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). This scheme provides distributors with incentives to solicit new customers and ensure proper service when the distributor knows that it will reap the benefits of the costs of solicitation and servicing.

Crawford's scheme, however, permits dealers flexibility in the event that they do wish to sell their products outside their territory. This flexibility cannot be accomplished without compensation to the distributors who will have to service Crawford's products which are used within their territories. Crawford responded to these competing, legitimate concerns with a policy of its own creation that distributors selling outside their territories must tender five (5%) percent of their sales price to Crawford to forward to the distributor who must service the product. Forwarded along with

these infrequent checks, Crawford sends the invoices to permit the servicing distributor to know the customer whom it must expect to service.[3]

## PRICE FIXING CLAIMS

Plaintiff claims that the defendants engaged in both vertical and horizontal price fixing.[4] This court finds that there is insufficient evidence upon which any claim of price fixing could rest.

### Vertical Price Fixing

To establish the existence of a vertical price restraint conspiracy under the Sherman Act, plaintiff must prove more than a unilateral announcement of suggested retail prices by Crawford and voluntary adherence by Crawford distributors. Plaintiff must demonstrate that Crawford engaged in some affirmative action to achieve uniform adherence to its suggested retail prices by inducing distributors to adhere to those suggested retail prices to avoid price competition. *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *United States v. Bausch & Lomb Optical Co.,* 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944). The mere publication of a suggested retail price list does not constitute a violation of the Sherman Act.

The evidence shows that Crawford distributors have routinely rejected Crawford's retail pricing suggestions, made their own pricing decisions, and suffered no penalty as a result thereof. Gibbons has itself had contact with three separate Crawford distributors, defendant Capital, Potomac and Franklin. On each occasion plaintiff received or was offered substantially different quantity blanket discounts on the purchase of Crawford products. The prices charged, or to be charged, under each quantity blanket discount differed by thousands of dollars. Thus, Gibbons has failed to establish the threshold requirement of a vertical price-fixing violation—namely, adherence by Crawford distributors to defendant Crawford's suggested retail prices.

Gibbons has also failed to produce any evidence indicating that Crawford has undertaken or threatened to undertake some course of conduct designed to compel compliance of its distributors with its suggested retail price list. In *Butera v. Sun Oil Co.,* 496 F.2d 434, 437 (1st Cir.1974) (footnotes omitted), the court, affirming a grant of summary judgment for defendant on a resale price maintenance claim, stated:

> [A] case of illegal resale price is made out when a price is announced and some course of action is undertaken or threatened contingent on the willingness or unwillingness of the retailer to adopt the price. The action need not necessarily fit under the rubric "coercion", but it must involve making a meaningful event depend on compliance or non-compliance with the "suggested" or stated price.

*Accord Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107 (5th Cir.1979). This plaintiff has not shown.

Since plaintiff has failed to introduce evidence of forced adherence to suggested retail prices, the issue of vertical price fixing may not be submitted to the jury. *Santa Clara Valley Distributing Co. v. Pabst Brewing Co.,* 556 F.2d 942 (9th Cir.1977). *See H.L. Moore Drug Exchange v. Eli Lilly & Co.,* 1981–2 CCH Trade Cas. ¶ 64,335 (2d Cir.1981) (judgment n.o.v.).

---

**3.** Plaintiff introduced no evidence at trial in support of its claim that defendants engaged in *massive* data dissemination in violation of section 1 of the Sherman Act. *See* footnote 2 *supra,* for plaintiff's claim "E". While it is undisputed that Crawford distributors received invoices and checks pursuant to Crawford's five (5%) percent service commission program, there is no evidence in the record that these exchanges were sufficiently frequent to permit the issue of massive data dissemination to be submitted to the jury. Rather, the only evidence on this issue, provided by defendants, was that the forwarded invoices represented a very small proportion of Crawford sales. On this record, plaintiff's claim is insufficient for jury consideration. *See United States v. Container Corp. of America,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969).

**4.** Plaintiff's memorandum of fact and law alleges four claims of price fixing, listed as offenses A–D. *See* footnote 2 *supra.*

*Horizontal Price Fixing*

 Plaintiff has alleged that defendants engaged in horizontal price fixing: 1) that Lennon and Callahan fixed the prices at which the Crawford manufacturers sold Crawford products; and 2) that Capital and Read allocated their territories and conspired to fix the prices at which they would offer Crawford products. There is insufficient evidence of either "horizontal" price fixing claim.

Suggested retail prices were set by Mr. Lennon, with the assistance of Mr. Callahan—both officers of Crawford. There is no evidence that any horizontal combination affected this vertical scheme of suggested retail prices. As discussed separately in this opinion, Messrs. Lennon and Callahan's establishment of Crawford prices for the five Crawford manufacturers could not be deemed "price fixing," as it is a natural and legal practice for corporate officers to set their corporations' prices. Furthermore, as the five manufacturing corporations are not competitors, but rather represent a level of Crawford's vertical distribution scheme, plaintiff errs in characterizing any price setting by Messrs. Lennon and Callahan as a horizontal agreement.

There is also insufficient evidence to show a horizontal price fixing scheme at the distributor level. Crawford's suggested retail prices were established solely by Messrs. Lennon and Callahan. The distributors did not affect this decision. Once in receipt of the suggested prices, distributors were free to determine for themselves the actual prices to be charged any customer. Plaintiff did not offer any evidence to show that the prices offered it by various Crawford distributors were uniform. Rather, the only evidence on this issue shows great differences between the prices offered by the different distributors to Gibbons.

In light of the above failures of proof by plaintiff, this court refuses to submit to the jury any issue with respect to the claims of horizontal price fixing.

## CONCERTED REFUSAL TO DEAL

The thrust of Gibbons' refusal to deal claim is a challenge of Crawford's restricted distribution system, which includes vertical territorial restrictions such as exclusive distributorships, assigned territories and a five (5%) percent service commission program.

 While Gibbons contends that a concerted refusal to deal originating at the distributorship level occurred, there is insufficient evidence to support this contention. Gibbons was able at all times to purchase Crawford products from distributors, after Capital notified it that it would no longer do business with Gibbons.[5] Defendant Read also refused to sell its products to Gibbons on the terms proposed by Gibbons.[6] There is insufficient evidence to show any concerted refusal to deal by Capital and Read. The evidence merely shows two distributors refusing to sell to Gibbons for independent and legitimate reasons.[7]

5. There is considerable evidence in the record of "bad blood" between Richard Kenney, of Gibbons, and the officers of Capital. This poor relationship resulted from personal conflicts between Richard Keeney and Robert D. Jennings and John Uhl of Capital as well as business activities of Mr. Keeney and a Capital salesman, Frank Blackburn, which circumvented a Capital sales policy to their personal advantage.

6. Richard Kenney taped his conversations with Read, without the latter's knowledge. The taped calls to Hays Glover, a sales trainee, and Fred Brunk, the sales manager at Read, do not prove a refusal to deal by Read. They merely show a willingness to sell to plaintiff on certain terms and conditions, and plaintiff's unwilling-

ness to buy on those terms and conditions. Moreover, the identical order Mr. Keeney ostensibly sought to fill with Read had already been filled by Potomac.

7. In addition to the reasons set forth in footnotes 5–6 *supra,* for Capital and Read's decisions not to sell to Gibbons, the record shows that Capital and Read refused to sell to Gibbons out of a desire to adhere to their distributorship contracts. There is no evidence in the record to show a concerted refusal to deal. Plaintiff argued that a letter, Plaintiff's Exhibit 21, written by Read to Crawford, supports its claim of a boycott:

Dear Bill:

We received the attached order [of Gibbons] from a company in New Orleans, La.

## CRAWFORD'S VERTICAL DISTRIBUTION SCHEME: A "RULE OF REASON" ANALYSIS

In light of the above findings, this court must conclude that the claims asserted can only be viewed as an allegation that the vertical restrictions and practices of Crawford violated the Sherman Act. Plaintiff alleges that the above described distribution scheme constitutes a variety of *per se* violations. This court finds, however, that the evidence does not permit such a characterization of the conduct at issue. This case is not of the same genre as such price fixing cases as *United States v. Container Corp.*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *United States v. Trenton Potteries Co.*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927); or *United States v. Nationwide Trailer Rental System*, 156 F.Supp. 800 (D.Kan.), *aff'd per curiam*, 355 U.S. 10, 78 S.Ct. 11, 2 L.Ed.2d 20 (1957). Rather, this case, with a vertical distribution scheme originating with and supervised by the manufacturer, cannot be subject to a *per se* analysis.

This court is persuaded by such cases as *Abadir & Co. v. First Mississippi Corp.*, 651 F.2d 422 (5th Cir.1981); *Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292 (5th Cir. 1981); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001 (5th Cir. 1981); *National Auto Brokers Corp. v. General Motors Corp.*, 572 F.2d 953 (2d Cir. 1978), *cert. denied*, 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 38 (1979); *Rice Tire Co. v. Michelin Tire Corp.*, 483 F.Supp. 750 (D.Md. 1980), *aff'd per curiam*, 638 F.2d 15 (4th Cir.), *cert. denied*, 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981); and *Tomac, Inc. v. Coca-Cola Co.*, 418 F.Supp. 359 (C.D.Cal. 1976), that Crawford's distribution scheme can only be judged under a rule of reason analysis. These cases, as well as many others cited in defendants' motions, present factual situations so close to the immediate case that no other conclusion is possible.

Although vertical restraints may reduce intrabrand competition by limiting the number of sellers of a particular product, they achieve distribution efficiencies and thereby promote interbrand competition. It is *interbrand* competition, rather than intrabrand competition, with which the antitrust laws are primarily concerned. Accordingly, vertical restrictions are analyzed under the rule of reason. *Continental*

---

We feel that this is probably a supply house that Bob Jennings has refused to sell. For this reason, we have refused this order and referred it to you for handling.

> Very cordially yours,
> Thomas A. Read

cc: Bob Jennins [sic]
 Capital Valve and Fitting Co.
enc.

This letter is insufficient, in light of the record in the case, to support plaintiff's claim of boycott. Read followed a policy against selling to "supply houses" for resale. This policy is based upon the need to identify the "end user" of Crawford products to guarantee proper service to the end user and proper application of the product. It was also motivated by the five percent service commission program already referred to and designed to protect the reliability of the product by proper service.

Even if this letter could be construed as a communication between distributors manifesting their hostility towards a resale customer like Gibbons, this construction would not give rise to an antitrust violation. *See National Auto Brokers v. General Motors Corp.*, 572 F.2d 953, 957 n. 7 (2d Cir.1978), *cert. denied*, 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 38 (1979). Gibbons was not injured by this communication of June 22, 1978. The uncontradicted evidence shows that the identical order referred to in Read's letter to Crawford had actually been filled by another distributor, Potomac, before Gibbons' initial request to Read had been made. *See* footnote 6 *supra.* No injury has been shown by the evidence submitted by plaintiff.

Plaintiff has also failed to offer any substantial evidence that Crawford took any action to persuade its distributors to refrain from dealing with Gibbons. *See National Auto Brokers v. General Motors Corp.*, *supra* at 957 n. 6. The most that can be inferred from plaintiff's evidence is that Crawford distributors communicated with Crawford to seek information on their distributorship contracts, and that Crawford answered their requests. The evidence can only be construed to show that Crawford did not force a distributor either to sell to or refrain from selling to a customer. It is undisputed that, after Read rejected Gibbons' contract terms, Crawford actively sought, and found, alternative distributors to fill Gibbons' orders.

*T.V., Inc. v. GTE Sylvania, Inc., supra* 433 U.S. at 58–59, 97 S.Ct. at 2561–62; *Muenster Butane, Inc. v. Stewart Co., supra* at 295; *Red Diamond Supply, Inc. v. Liquid Carbonic Corp., supra* at 1005. As the Fifth Circuit explained in *Abadir & Co. v. First Mississippi Corp., supra* at 426–27 (footnote omitted):

> The distributor or distributors on whom [vertical restraints] are imposed are only benefited by a reduction in competition. But the supplier imposing such [restraints] has several potential economic advantages which are legitimate: attracting competent and aggressive retailers, inducing retailers to engage in promotional activities, market-distribution efficiency, and maintaining control over the safety and quality of the product.

In *Abadir* the court held that a vertical restriction upon a dealer to sell only to customers in a specific area is evaluated under the rule of reason.

■■■ In some cases, an agreement, combination, or conspiracy between a manufacturer and its distributors may be treated as horizontal. This occurs only when the source of the conspiracy is a combination of the distributors. Where the alleged originator of the conspiracy is the manufacturer, the conspiracy is treated as a vertical restraint. *Red Diamond Supply, Inc. v. Liquid Carbonic Corp., supra* at 1004; *H. & B. Equipment Co., Inc. v. International Harvester,* 577 F.2d 239, 245–46 (5th Cir.1978). The Fifth Circuit has observed that given the divergent interests between a manufacturer and its distributors, it is unlikely that a manufacturer not controlled by its distributors would be a party to a distributor-created, and hence distributor-serving, conspiracy. *Red Diamond Supply, Inc. v. Liquid Carbonic Corp., supra* at 1005.

■■■ Gibbons also argues that because Messrs. Lennon and Callahan indirectly own, in part or in whole, some of Crawford's distributors, the alleged agreement is among horizontal competitors. This argument has been rejected by this circuit:

> When a producer elects to market its goods through distributors, the latter are

not, in an economic sense, competitors of the producer even though the producer also markets some of its goods itself; rather, the distributors are "agents" of the producer, employed because the producer has determined that it can supply its goods to consumers more efficiently by using distributors than it can by marketing them entirely by itself.

*Red Diamond Supply, Inc. v. Liquid Carbonic Corp., supra* at 1005. *Accord Abadir & Co. v. First Mississippi Corp., supra* at 424–25, 428.

■■■ Gibbons would thus have been required to show that Crawford's distribution scheme caused an injury to competition by an unreasonable restraint of trade, and resulted in an injury to plaintiff. This court finds that plaintiff has failed to prove either an injury to competition or an injury to itself—issues upon which it had the burden of proof—and thus directs the verdict on the Sherman Act section one claims for defendants.

## NO INJURY TO COMPETITION WAS SHOWN

Plaintiff has failed to introduce any evidence that defendants' alleged actions caused an "injury to competition."

■■■ As held by this circuit in *Muenster Butane, supra,* and *Red Diamond, supra,* proof of an anticompetitive effect is necessary to plaintiff's case under a rule of reason analysis. Plaintiff has failed to produce such evidence, alleging only a reduction in *intrabrand* competition for Crawford products. This circuit, in *Muenster Butane* and *Red Diamond* has held that absent proof that defendant does not encounter significant competition from producers of competing products, an alleged reduction in intrabrand competition is insufficient to establish injury to competition. Since, as this court finds in disposition of defendants' motion on the section 2 claims, Crawford's products were reasonably interchangeable with those of many other manufacturers in a highly competitive industry, this court is constrained to conclude that plaintiff has failed

to provide any proof of injury to competition.

■ Additionally, the testimony of Dr. Thomas R. Saving made it abundantly clear from undisputed government statistical sources that Crawford is a small segment in the industry and completely lacks market power. This being so, it cannot affect the price of its product. It follows, therefore, that any vertical restraint on this ground alone, would not be anticompetitive at the intrabrand level.

## NO INJURY TO PLAINTIFF WAS SHOWN

■ Plaintiff alleges that, as a result of defendants' concerted refusal to deal, it suffered injury to its business. There is no "conflict in substantial evidence," however, to create a jury question on this essential element of plaintiff's claim.

There is no evidence in the record that plaintiff was ever unable to purchase Crawford's products. Plaintiff's own witnesses admitted and documents in the case demonstrate the fact that it was *never unable* to fill an order it received from the date the alleged boycott commenced through the present. Once Capital refused to sell its product to Gibbons, the latter was immediately able to fill its orders from another distributor, Potomac. Moreover, another distributor, Franklin, was made available and remains available to fill any orders which Gibbons might require to be filled.

The uncontradicted evidence in the record shows that Gibbons never compared its discount "blanket" contract with Capital with those of either Potomac or Franklin to ascertain which distributorship offered it a better contract. The only evidence on the record demonstrates that both Potomac and Franklin offered Gibbons better discounts than had Capital. Moreover, Dr. Philip D. Robers, an expert witness for defendants, a management consultant specializing in transportation problems, testified that upon comparison of the transportation costs and delivery times under the three actual or proposed distributor contracts with Gibbons, Capital contract performance had been the least desirable of the three.

Plaintiff has provided no evidence that it had fared better with Capital than with the continually available alternatives it was offered or of which it availed itself. Plaintiff's claim of injury is not sufficiently supported by the circumstances of its geographical location in New Orleans, its testimony that it was initially compelled to purchase through a "subterfuge" from Potomac,[8] or that its special handling by a Capital employee concerned with retaining his commissions generated by Gibbons' purchases from Capital[9] made Capital's contract preferable.

As stated by this circuit in *Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 863 (5th Cir.1981), in a "refusal-to-deal case, a plaintiff who bypasses an obviously adequate alternative supplier should not recover for loss of his business."

**8.** Richard Keeney testified that after Capital declined to sell him Crawford products, he had a relative purchase Crawford products from Potomac for him using his name to order. Mr. Keeney gave this purchaser a small percentage commission for his efforts.

Mr. Keeney testified that he felt compelled to act through this "subterfuge" out of a fear that, if Gibbons became known as the purchaser, Crawford distributors would refuse to sell to him. Since, as this court has found above in its discussion of plaintiff's section 1 claims, Gibbons had not been a victim of any boycott by Crawford distributors, Mr. Keeney's claims of compulsion to act through a subterfuge are irrelevant to a consideration of any injury he may have suffered. Mr. Keeney's actions were not legally caused by defendants and therefore

cannot be viewed as an "injury" for Sherman Act section 1 purposes.

**9.** The salesman in charge of Gibbons' account at Capital was Frank Blackburn. This account was a large one for Mr. Blackburn, and generated a large commission for him. Mr. Blackburn therefore sought to retain the account by accomodating Mr. Keeney's requests for special packaging and expeditious delivery, even when doing so proved a fairly onerous task. Such special and expeditious treatment was not usually provided by Capital to its customers. Rather, it was rare that any customer would be provided this service and Gibbons was perhaps alone in the frequency with which its demands were accommodated by Capital.

Plaintiff offered evidence that had its expectations of a constant supply of goods from Capital not been frustrated, it would have been able to expand its European market. Since, however, it was not guaranteed this supply from *Capital* its claim is that it could not expand its business as it would otherwise have expanded.

Even if Gibbons considered itself "frustrated," this circumstance however manifested, does not allege a cognizable antitrust injury in this case. Gibbons always had a supply of Crawford products, and was assured an alternate supply of which it chose not to avail itself. Gibbons is clearly chargeable with having failed to minimize the damages it claims resulted from Capital's refusal to deal with it. *See Malcolm v. Marathon Oil Co., supra* at 862–63; *Golf City, Inc. v. Wilson Sporting Goods Co., Inc.,* 555 F.2d 426, 436 (5th Cir.1977) ("An antitrust plaintiff has a duty to mitigate damages").

Moreover, there is no allegation by plaintiff that the valves and fittings of other manufacturers were not available to it. The record reveals that the market of valves and fittings is a highly competitive one, consisting of hundreds of manufacturers of competing products. Plaintiff has always had access to these other brands and has availed itself of these competing brands on a fairly continuous basis.

While the defendants introduced the testimony of Dr. James C. Boland, a certified public account with business management background, that the exportation of valves and fittings produced a loss for the Gibbons company, this court prefers to accept *pro tanto* the Gibbons claim that it was making a profit and that the refusal of Capital to continue to do business with it frustrated its hopes for an increased volume of business in Europe and elsewhere. As already indicated, this would not constitute a valid antitrust injury in the circumstances of this case.

## ADDITIONAL BASES FOR DISMISSING PLAINTIFF'S FIRST TWO CLAIMS UNDER SHERMAN ACT SECTION ONE

Plaintiff's first two claims allege horizontal price-fixing at the manufacturing level and vertical price-fixing from the manufacturing level to the regional warehouse level.[10] Defendants moved for a directed verdict on these claims on the grounds that the evidence was insufficient to have them submitted to the jury in two additional respects: 1) the defendant corporations and individuals were unable, as a matter of law, to combine or conspire with each other as alleged by plaintiff; and 2) plaintiff lacked standing to challenge the actions of defendants engaged at the regional warehouse level and above. This court agrees.

## NO COMBINATION OR CONSPIRACY

▮ Plaintiff's claims allege that Fred A. Lennon and Francis J. Callahan, officers of Crawford at all times relevant to this litigation, set the prices at which Crawford, Whitey, Nupro, Cajon, Sno-Trik, Central Swagelok, Southern Swagelok, and Eastern Swagelok sold Crawford valves and fittings. As a matter of law, this court finds that Messrs. Lennon and Callahan are incapable of conspiring to fix the prices of the above corporations.

It is well-settled, as plaintiff concedes, that there can be no conspiracy between a corporation and its corporate officer. *Solomon v. Houston Corrugated Box Co.,* 526 F.2d 389, 396 (5th Cir.1976); *Nelson Radio & Supply Co. v. Motorola, Inc.,* 200 F.2d 911, 914 (5th Cir.1952), *cert. denied,* 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953).

In the immediate case, therefore, Messrs. Lennon and Callahan do not have the capacity to conspire with Crawford and the Crawford manufacturers and warehouses of which they are officers. There is no doubt that Mr. Lennon calculates the prices at which his companies sell their products.

**10.** *See* footnote 2 *supra,* for plaintiff's first two claims of defendants' misconduct, listed as offenses A and B.

The Crawford manufacturing companies' prices are set forth in a price list, established by Mr. Lennon. Mr. Lennon then calculates the prices at which the regional warehouses acquire Crawford products from its manufacturers. The use of such a price list and the discount schedules for bulk purchases permits the Crawford warehouses to offer Crawford distributors its products throughout the country without the possibility of price discrimination. Plaintiff offers no reason why it should be improper for an officer, employee and controlling shareholder of family-owned companies to decide matters necessary to the operations of his enterprise. Those corporations must sell their products at some price. This court is unable to comprehend any basis for viewing as "price fixing" this basic corporate need to price its own products.

Mr. Lennon had the final decision as to the setting of prices for Crawford products. Mr. Callahan, as an officer and shareholder of the Crawford companies, assisted Mr. Lennon in establishing Crawford prices. This effort does not supply the "conspiracy" element necessary to a section one violation. It is natural for officers of a corporation to consult each other over corporate policy. To extend potential antitrust liability to such routine corporate activities would be a dangerous extension well beyond the intended reach of the antitrust laws.

### LACK OF STANDING

The evidence in the record shows that plaintiff Gibbons has never purchased the Crawford product directly from the defendants involved in these two allegations of price fixing. Moreover, the evidence shows that plaintiff would have had no right to purchase products wholesale, directly from either the warehouses or manufacturers. The only concerns from whom plaintiff did or could purchase Crawford products are the Crawford distributors. Plaintiff does not name any of these distributors as defendants in its first two claims of price fixing.

One who has not purchased directly from an alleged antitrust violator is pre-cluded by law from asserting a claim for price fixing against the alleged violator. The Supreme Court has ruled that an indirect purchaser is not "injured" in his business or property by such an alleged violation. *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). Thus, plaintiff Gibbons lacks standing to assert its first two claims of price fixing against the corporations with which it has never dealt.

### C. MOTION FOR DIRECTED VERDICT ON SECTION 2 ATTEMPT TO MONOPOLIZE AND CONSPIRACY TO MONOPOLIZE CLAIMS

The offense of *attempt to monopolize* has two elements:

1) specific intent to acquire monopoly power in the relevant market and

2) a dangerous probability of success in that endeavor.

The offense of *conspiracy to monopolize* has three elements:

1) an agreement;

2) entered into with the specific intent to accomplish the unlawful result of achieving a monopoly; and

3) the commission of an overt act in furtherance of the conspiracy.

Prior to trial, plaintiff Gibbons withdrew any claim of monopolization it may have at one time asserted. Plaintiff states his section 2 claims as attempt to monopolize and conspiracy to monopolize the *Crawford product* in the *North Sea* area. The threshold inquiry for establishing the existence of either offense is the relevant *product* and *geographic* market for Crawford's goods. Plaintiff bears the burden of proving the relevant market. *United States v. E.I. DuPont de Nemours & Co.,* 351 U.S. 377, 381, 76 S.Ct. 994, 999, 100 L.Ed. 1264 (1956); *Spectrofuge Corp. v. Beckman Instruments, Inc.,* 575 F.2d 256, 276 (5th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979).

■ Failure of proof on this issue would be sufficient to remove the alleged offenses from the jury's consideration.

In the immediate case, plaintiff Gibbons has failed to present evidence which would permit a finding that the "Crawford Product in the North Sea" is the relevant market for purposes of stating a Sherman Act section 2 violation.

■ A fundamental error underlying plaintiff's case has been its view of the product market as confined to Crawford products. This proferred view is wholly inconsistent with the actual test enunciated by the Supreme Court, *i.e.,* the product market in which *any* given produce competes "is composed of products that have *reasonable interchangeability* for the purposes for which they are produced—price, use and qualities considered." *United States v. E.I. DuPont de Nemours & Co., supra* 351 U.S. at 404, 76 S.Ct. at 1012 (emphasis added).

None of the cases cited by the plaintiff in its memorandum in opposition to defendants' motion support its contentions when applied to the evidence adduced at trial. The record contains no suggestion that Crawford products are unique, so as to constitute a market unto themselves, under the requisite test of "reasonable interchangeability." Nor does the record offer any evidence that Crawford faces little, or no, competition from the marketplace in its manufacture of valves and tube fittings. Rather, the only evidence in the record leads to the conclusion that Crawford products are "reasonably interchangeable" with those of hundreds of other manufacturers in an intensely competitive industry. Persuasive and uncontradicted evidence was presented by defendants' expert witness, Dr. Thomas R. Saving, a professor of economics and a consultant of long experience in the antitrust field. His testimony included an examination of the United States Bureau of Census' published statistical findings of industrial concentration ratios. Of the 438 industrial segments compared by the Bureau of Census in a table in evidence, the valve and fitting industry is 30th from the bottom of the list. Dr. Saving's conclusion drawn from this and other evidence was that the valve and fitting industry is highly competitive. Plaintiff offered no evidence to the contrary. Rather, plaintiff's own expert and lay witnesses on cross-examination and by deposition admitted the competitive nature of the valve and fitting industry.

■ Plaintiff has suggested that Crawford products were a market unto themselves and that the products were not "reasonably interchangeable" because their component parts were not perfectly interchangeable with the component parts of other manufacturers' products. This argument confuses the definition of "product market" for antitrust analysis. Reasonable interchangeability of the total product is the standard and not, as plaintiff suggests, identity of the product and its component parts. To adopt plaintiff's view would render every manufacturer a monopolist of his own product, a result which flies in the face of the antitrust laws. The Supreme Court squarely dismissed plaintiff's theory in *United States v. E.I. DuPont de Nemours & Co., supra* at 380–81, 76 S.Ct. at 999:

> Every manufacturer is the sole producer of the particular commodity it makes but its control in the [section 2] sense of the relevant market depends upon the availability of alternative commodities for buyers ... This interchangeability is largely gauged by the purchase of competing products for similar uses considering the price, characteristics and adaptability of the competing commodities.

■ The mere existence of patents on a few of Crawford's 4,000 products does not render its product unique for purposes of section 2 analysis, inasmuch as the record unequivocally demonstrates the reasonable interchangeability of Crawford products with those of hundreds of others in a highly competitive industry. The existence of patents in antitrust cases has never led the Supreme Court or the courts of this circuit to find the patent holder *as such* a monopo-

list of his patented product.[11] Only if, coincidentally, the patented product is not reasonably interchangeable with other manufacturers' products may it be considered unique in antitrust parlance. In the immediate case, the existence of a few, extremely "thin" patents owned by Crawford cannot raise any reasonable inference that Crawford products constitute a relevant product market. This is demonstrated by the *actual* existence of hundreds of other manufacturers competing with Crawford for sales in this industry.

Mr. Callahan, when called as plaintiff's witness, testified that since 1850 over 80,000 patents have been issued in the valve and fitting industry; that all of Crawford's competitors have patents, and that 1700 to 1800 are considered to be current. The existence of this large number of patents has not impaired the intensely competitive character of this industry.

None of the cases cited by plaintiff in support of its assumption that Crawford products is the relevant product market are persuasive. All the cases cited are clearly distinguishable, including the two cases stressed by counsel at oral argument of the motions. In *Associated Radio Service Co. v. Page Airways, Inc.,* 624 F.2d 1342 (5th Cir. 1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981), the Fifth Circuit upheld the jury's finding that the product market was limited to a single manufacturer where there was "ample evidence of high entry barriers and of the difficulty ... encountered in switching back and forth from one model of aircraft to the next ...." *Id.* at 1349. In the immediate case, as stated above, there is no such special factor capable of raising any doubts as to the "reasonable interchangeability" of Crawford products with those of its many competitors. Similarly, the case of *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338 (3d Cir.1975), is not persuasive. In *Coleman,* the Third Circuit ordered a new

trial on the plaintiff's claim that defendant attempted to monopolize the Dodge car market in Allegheny County because the trial court had erroneously assumed that narrow market in its instructions to the jury. The circuit court declined to enter a judgment notwithstanding the verdict, although the parties conceded that no section 2 violation would exist if a broader product market were assumed, solely because the very "confused" trial record on this issue made a new trial "just under the circumstances." *Id.* at 1349 (quoting 28 U.S.C. § 2106). Neither the procedural nor the substantive posture of the *Coleman* case is present before this court.

Conversely, this court is persuaded by the cases cited by defendants in their memorandum on the issue of relevant market. The Fifth Circuit's opinion in *Muenster Butane, Inc. v. Stewart Co., supra* at 295–96, is particularly persuasive, as are the opinions in *H. & B. Equipment Co. v. International Harvester Co., supra,* and *Rice Tire Co. v. Michelin Tire Corp., supra.*

The record is also devoid of evidence to establish the relevant geographic market in which Crawford competes. Plaintiff's only expert witness, Dr. Urban Ozanne, expressly disavowed making any finding with respect to the relevant geographic market. Moreover, a diligent search of the record for any lay testimony on this issue discloses no substantial evidence to create a jury question. The attenuated inferences drawn from evidence in the record by plaintiff would constitute, at the very most, "a mere scintilla of evidence." This court thus finds that the evidence presented by plaintiff is insufficient to define the relevant geographic market and is equally insufficient to permit a jury to conclude that the North Sea area constitutes the geographic market.

The above failure of proof by plaintiff constrains this court to hold that plaintiff's claims under section 2 of the Sherman Act

---

**11.** The Supreme Court, in dealing with cellophane, a patented article, emphasized that "[i]llegal power must be appraised in terms of the competitive market for the product," concluding that the product market was flexible packaging material, and not cellophane. *United States v. E.I. DuPont de Nemours & Co., supra* at 393, 394–404, 76 S.Ct. at 1006, 1007–12.

must be dismissed. No reasonable jury could conclude, on the basis of the evidence introduced at trial, that Crawford could be held liable for either attempt to monopolize or conspiracy to monopolize the only product market substantiated by the record—that of valves and fittings.

## PREDATORY PRICING CLAIM

Plaintiff's complaint alleged "predatory pricing" by defendants in the pricing of Crawford products in the European market.[12] At trial, this charge was dropped as an independent basis for recovery. Plaintiff, however, continued to allege predatory pricing as one of several actions by defendants which, taken together, violated the Sherman Act.[13] Defendants moved for a directed verdict on this claim at the close of plaintiff's case. After oral argument, the motion was granted.

Plaintiff's only evidence on this issue surrounded alleged "price reductions" in Crawford products sold in Europe. This evidence is wholly insufficient, as a matter of law, to constitute predatory pricing.

Gibbons' claim is based upon a 1978 currency adjustment by Crawford in its sale of products in Europe. In 1978, Crawford sold its United States manufactured products to the European market through its warehouse, Microventil, in Switzerland. It thereby transacted all European business in Swiss francs, the home currency of Microventil.

Crawford set the price for its European sales by a straight mathematical formula based upon its United States price list. Their domestic price was multiplied by a factor which reflected the value of the franc to the dollar and which took into account a markup for transportation and costs.

From 1977 to 1979, the currency exchange rates between the dollar and Swiss franc fluctuated greatly. This instability caused distortion in the price of Crawford products sold in Europe. As a result, Crawford reevaluated its currency adjustment formula and began to update its currency conversion factor periodically in an effort to keep its European prices consistent with those in the United States.[14] The United States price list never reflected a reduction in prices. Although these adjustments were imperfect, they narrowed the differential in price which would have otherwise existed.[15]

---

12. Plaintiff's predatory pricing allegations are contained in Paragraph 20 of the complaint: 20. In October and November of 1978, in order to defeat the export business that plaintiff had been able to reinstate because of its supply from Potomac Valve & Fittings, Inc., Defendant Crawford caused its European distributors to institute sudden, drastic, and discriminatory price reductions on Crawford Product with Crawford's support. These price reductions destroyed the profitability of plaintiff's reinstated export business. In paragraph 30(e) and 31(e) plaintiff calls this "predatory pricing."

13. At oral argument on defendants' motion for a directed verdict on the predatory pricing claim, plaintiff claimed that defendants' predatory pricing, concerted refusal to deal and distributorship restrictions supported its Sherman Act section 2 claims of attempt to monopolize and conspiracy to monopolize.

14. The officers of Crawford initially disagreed as to the mechanics of implementing the currency adjustments. As a result, the frequency and immediacy of adjustments varied.

15. Dr. Thomas R. Saving, an expert witness for defendants and professor of economics, explained at trial that the currency exchange rates were so unstable during this period that Crawford's adjustments were too sporadic and delayed to compensate perfectly with the actual market changes.

The following chart, prepared by Dr. Saving and introduced into evidence at trial, shows what a product that cost a dollar in Swiss francs in January 1977, would have cost at the beginning of each month for the three years 1977, 1978 and 1979, if the Crawford conversion factors were used.

| | 1977 | | 1978 | | 1979 | |
|---|---|---|---|---|---|---|
| 1 | 1.00 | 1.00 | 1.230 | 1.127 | 1.517 | .989 |
| 2 | .975 | .975 | *1.236 | *1.042 | 1.437 | .940 |
| 3 | .958 | .958 | 1.344 | 1.134 | 1.444 | .945 |
| 4 | .961 | .961 | 1.343 | 1.133 | 1.444 | .945 |
| 5 | .972 | .972 | 1.257 | 1.057 | 1.424 | .932 |
| 6 | .976 | .976 | *1.304 | *1.019 | 1.413 | .942 |
| 7 | .991 | .991 | 1.321 | 1.033 | 1.476 | .9617 |
| 8 | *1.018 | *1.010 | 1.416 | 1.107 | 1.469 | .9617 |
| 9 | 1.021 | 1.013 | *1.491 | *.976 | 1.478 | .9675 |
| 10 | 1.041 | 1.033 | *1.575 | *.945 | 1.5723 | 1.01 |
| 11 | *1.098 | *1.00 | 1.655 | .993 | 1.485 | .972 |
| 12 | 1.142 | 1.046 | **1.412 | **.924 | 1.559 | 1.02 |
| Mean | | 1.012 | | 1.04 | | .965 |

* Conversion factor decrease
** Conversion factor increase

Gibbons alleges that the above currency adjustment constituted predatory pricing. This contention is wholly erroneous.

First, Gibbons has offered no evidence to support its assertion that a predatory price reduction occurred in 1978.[16] The only witnesses who testified on this matter for plaintiff did not deny that a currency adjustment had been made. Rather, they merely gave conclusory testimony that the prices had been dropped. Their testimony showed an apparent confusion over the procedure and effects of a currency adjustment. The above conclusory and confused testimonial allegations of predatory pricing are insufficient to warrant the submission of any such issue to the jury.

 Second, Gibbons conceded that defendants' pricing of their products had always been above cost. It argued, however, that this court recognize their allegations as constituting "quasi-predatory pricing." This court declines to thus expand the concept of predatory pricing well beyond its intended reach.[17] A pricing policy which results in a profit cannot, as a matter of law, result in predatory pricing.[18]

Under the applicable legal standard, therefore, plaintiff has neither alleged nor offered evidence of predatory pricing.

## CONCLUSION

Plaintiff's motion for a directed verdict is denied. Defendants' motion for a directed verdict is granted. The action is dismissed with costs to plaintiff.

## OPINION ON COUNTERCLAIM

Defendants-counterclaimants have moved for a judgment notwithstanding verdict or, in the alternative, for a new trial after a jury verdict in favor of plaintiff on the counterclaim. Defendants' motions allege that: 1) the verdict was contrary to the weight of the evidence; 2) the court omitted from its interrogatories a material issue of fact raised by the pleadings and by the evidence in the case; and 3) the jury was unduly prejudiced by statements in the closing argument of plaintiff's counsel.

This opinion is concerned with the disposition of the counterclaim submitted to a jury on November 18, 1981. The main action, brought under sections 1 and 2 of the Sherman Act, was not submitted to the jury, because the court granted defendants'

---

Column 1 for each year shows what the dollar cost would have been if no adjustments had been made by Crawford in its conversion factor. Column 2 for each year shows the adjusted prices that reflect the changes in Crawford's conversion factor. The points where the changes occurred are indicated by asterisk. As explained by Dr. Saving:

The average cost of a dollar in 1977 was $1.01 and in 1978 was $1.04. In other words, for all of the 1978 Crawford's European prices were some 4% higher than in 1977 because they were not able to keep up with exchange rate movements. Only in the latter part of 1978 does Crawford ever succeed in getting the price back to near a dollar and then they overshot the mark slightly. By November, they were approximately even again. During the latter part of 1978, the dollar improved against the franc and Crawford's response was to adjust its conversion factor upward. By January 1979, the conversion factor was approximately back to a dollar.

16. Plaintiff argued that the depositions of David Cheetham, a Crawford distributor in the United Kingdom, offered evidence of a price

reduction. Mr. Cheetham referred at one point in his depositions to a 1978 "drop" in Crawford's European prices and later in his deposition stated that he was uncertain whether his prices to his customers had dropped or risen in 1978. This court finds that counsel cannot rely on this reference in support of its case. Mr. Cheetham clearly explained that if the prices were "dropped" it was *due to* variations in the exchange rate. This statement, when taken in context, is not sufficient evidence of predatory pricing.

17. See *Transamerica Computer Co. v. International Business Machines Corp.*, 481 F.Supp. 965, 990 (N.D.Cal.1979) ("Appropriately low prices are to be encouraged, not discouraged. The punitive impact of the antitrust laws must not be permitted to compel high prices.")

18. See *International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714 (5th Cir. 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976); *Transamerica Computer Co. v. International Business Machines Corp.*, supra. See also *Broadway Delivery Corp. v. United Parcel Serv.*, 651 F.2d 122 (2d Cir.1981).

motion for directed verdicts at the close of the evidence submitted by both sides. The court announced its disposition of the antitrust claims in open court along with a succinct explanation of the grounds therefor, and later filed an opinion setting forth in detail the basis for its ruling. That opinion, dated December 4, 1981, was filed on December 8, 1981.

█ The jury considered the narrow issue raised by defendants' counterclaim under a Louisiana general tort statute which provides as follows:

Art. 2315. Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. [Louisiana Civil Code]

In essence, the defendants claimed that they had been put to a very substantial expense of considerably more than a million and a half dollars to defend the plaintiff's lawsuit, which was baseless, and which was brought for the ulterior purpose of forcing the defendant Crawford into awarding a distributorship to plaintiff. The questions submitted to the jury are set forth in an appendix attached hereto. Since the affirmative answer by the jury to the first question indicated that the lawsuit had been brought in good faith after full disclosure to the plaintiff's attorneys, the jury was instructed to go no further, and the court directed entry of a judgment in favor of plaintiff.

The court does not agree that the verdict is tainted by any legal insufficiencies or by faulty factual findings.

The Louisiana statute in question did not provide the court with any firm guidance regarding its application to the facts of this case, nor was the court able to find any precedents in the jurisprudence of Louisiana which permitted the use of this statute as support for a tort damage claim essentially because the plaintiff brought a legally baseless action. It is assumed for the purposes of the discussion which follows that the plaintiff had no valid antitrust claims against the defendants. This was the gist of the court's ruling at the close of the evidence. The court reaffirms that ruling.

There was abundant evidence in the case that Messrs. Richard and Cecil Keeney, the principal actors for the plaintiff in the transactions preceding the lawsuit, were anxious to do business with the defendant Crawford, the manufacturer of valves and tube fittings, on a basis which would rebound to their profit either by way of a distributorship or by being permitted on some agency basis to exploit the Crawford export business. At various times and places the Messrs. Keeney manifested their desire to establish a working relationship with Crawford and indeed after the lawsuit was begun indicated their willingness to settle the litigation in return for a distributorship.[1] Mr. Richard Keeney had been a salesman for one of the Crawford distributors, the defendant, Capital Valve and Fitting Co., Inc. (Capital), of Baton Rouge, Louisiana. He was privy to the method and extent of their profitable operations and at one time, subsequent to his employment with Capital, a suggestion was made on his behalf that Capital's Louisiana distributorship territory be reduced in size and that his company, Gibbons, should be allotted the substantial area remaining. There was also evidence which, if accepted by the jury, would have indicated that the Messrs. Keeney made less than a full disclosure of the facts relating to the availability of Crawford products to their New Orleans attor-

---

1. The court instructed the jury:

"Now public policy favors the settlement and quieting of litigation. No adverse inferences should be drawn against Gibbons or the Keeneys if you believe they acted in good faith in making various proposals for the termination and settlement of any litigation with the defendants Crawford, Capital and Read.

On the other hand, if you believe that these proposals were made in bad faith and for the purpose of using the litigation process as a means of coercing the defendants into awarding a distribution arrangement to Gibbons, a different conclusion would be justified."

*Proceedings of November 17, 1981,* Charge to Jury, at 97. The court had occasion to repeat this instruction in an answer to one of the jury's questions during deliberations.

neys, Messrs. Fishman and Schaub[2] when they were first consulted about their alleged grievances against the defendants. There is evidence to support the view that these attorneys were not told the full truth and that they were thereby manipulated for the purpose of bringing about a baseless assertion of grievances against the defendants and using the threat of litigation to secure a distributorship agreement with defendants. However, there was countervailing evidence that Messrs. Fishman and Schaub were advised in October 1978 to the effect that plaintiff had a source of supply for Crawford products in the Washington, D.C. area—information necessary to effective legal advice on plaintiff's several boycott claims. Ultimately, and when the San Francisco attorneys were retained to file suit and to represent the plaintiff at trial, there is no dispute that a full disclosure was made as of that time, as the complaint in the action filed in March 1979 attests.

■ The jury's answer to the first question exculpates the Messrs. Keeney, and hence the plaintiff Gibbons, of any bad faith in their factual disclosures to their attorneys. The court can construe this finding as applicable generally to all the attorneys retained by them. So construed, the facts reduce themselves substantially to this: That the facts related to the attorneys were substantially complete and accurate and constituted, at least in the attorneys' opinion, a valid basis for the lawsuit. In the light of this, there was no justification for asking the jury to consider the second question as to whether Gibbons brought the law suit in bad faith for the purpose of obtaining a distributorship arrangement from Crawford. An inquiry into the motives of the plaintiff, in light of the answer to the first question, would have been superfluous. If Gibbons' grievances were asserted by its attorneys after a good faith disclosure of all the facts it would seem redundant to press the inquiry further in order to determine the possible additional or hidden motives which gave rise to the lawsuit. Litigants are seldom in love with each other. Indeed, litigants may and often do manifest very deep reciprocal hostility and animosity. Unfortunately, this appeared to be the case in this litigation. This court declines to construe the statute to mean that a facially viable and valid lawsuit can be tainted and become the subject of a tort action by virtue of unfriendly or ulterior motives entertained by the persons initiating the suit. It seems to this court that a vast area of public policy touching upon the availability of legal remedies would be impinged upon by any such inquiry. The statute in question would require operative terms of a far more explicit nature to permit it to be applied under these circumstances. Even if it were so drawn as to permit such an interpretation, this court has serious reservations regarding the validity of such a statute.

The foregoing discussion does not detract from the lamentable situation in which the defendants presently find themselves. They have expended more than one million seven hundred thousand dollars to defend themselves against what this court believes were legally baseless claims under sections 1 and 2 of the Sherman Act. Unhappily, this is neither the first nor the last case before the courts in which a frightful burden of expense and inconvenience will have been imposed upon a successful litigant. The court concludes nevertheless that it must accept the jury's answer to question 1 as dispositive of the issues under the counterclaim. The very bitterly disputed issues of fact have been decided by the jury and the court cannot find any valid basis for setting aside the jury's verdict. There was sufficient evidence to justify the verdict.

The assertedly prejudicial summation of plaintiff's counsel presents a very troublesome problem, however. The defendants-

2. These lawyers do not appear to have been in continuous contact with the Keeneys after October 1978. However, their firm, Sessions, Fishman, Rosenson, Boisfontaine & Nathan, clearly remained as New Orleans counsel to plaintiff after suit was initiated in March 1979; and there was sufficient evidence to justify the jury's conclusion that there had been full disclosure by the Messrs. Keeney to them as well as to San Francisco counsel, Alioto & Alioto.

counterclaimants have also moved for a new trial on the ground that the closing argument of plaintiff's counsel unduly prejudiced the jury. As noted by the Fifth Circuit:

"Courts usually permit reasonable latitude in counsel's final arguments to the jury. Proficiency in jury argument, an ability to sway doubtful minds, a method of convincing others of the rightness of one's positions are important not only to successful advocacy but also to effective representation of the client's interests. But advocacy is circumscribed both by an attorney's own professional responsibility and the court's obligation to provide the parties a fair trial."

*Edwards v. Sears, Roebuck & Co.,* 512 F.2d 276, 283 (5th Cir.1975).

This case involved a bitter personal dispute between the parties, and various of their employees and officers. The parties, and to varying extents their counsel, evidenced a concern in the outcome of the case extending beyond the financial interests of the parties. This concern was, no doubt, evident to the jury.

The closing arguments of counsel for both parties were rendered in words and tones indicative of commitment to their respective clients.

At times, counsel for plaintiff presented arguments and made references to defendants based on facts wholly unsupported by the record and unduly inflammatory in nature. Rather than confining his argument to the jury to the evidence relating to the elements of the counterclaim,[3] counsel engaged in repeated discourse on plaintiff's charges that defendants had violated the Sherman Act.[4] The court had cautioned

---

3. As this court instructed, the counterclaim contained three elements: 1) fault; 2) causation; and 3) damage. *See Ancora Corp. v. Stein,* 445 F.2d 431 (5th Cir.1971). This counterclaim, arising under Louisiana Civil Code Article 2315, necessitated an inquiry as to whether plaintiff brought its lawsuit in good faith after full disclosure of the facts within the knowledge of Messrs. Richard and Cecil Keeney to their attorneys. The interrogatories submitted to the jury are reproduced in the appendix.

4. Examples of such improper statements are excerpted from plaintiff's summation as follows:

"Before we analyze the evidence of what we respectfully submit to you is a sham counterclaim brought by a powerful company to crush a little company, which beat it in the market place over in Scotland and in Norway, just beat this cartel right in the market place, and all this counterclaim is when he speaks of motivations, the only motivation that exists in this case, Ladies and Gentlemen of the Jury, is the motivation of a dominant company determined that it is going to monopolize the market in the North Sea, being upset by the fact that a young man who was an experienced salesman, not a rich, young man—that kind of prejudice is really not worthy of eminent counsel, we don't make references to the fact that Mr. Callahan married the boss' niece, and we ought not to make those references."
[*Proceedings of November 17, 1981,* at 25.]
"Then you got the other attempt to prejudice you; this is the way monopolists always act. I have practiced this 30 years in the courtroom, the other counsel tend to prejudice you by talking about some offensive act that took place."
[*id.* at 26–27.]
"All a boycott is, and don't be misled, all a boycott is or even a conspiracy, don't be misled by these terms, all it is is an agreement or a collaboration between businessmen not to sell or to impair or damage the sales efforts of somebody involved. I am now on just that issue, of this supposed hostility."
[*Id.* at 30.]
"If he wanted to throw that product in Lake Pontchartrain, that was his business from there on in. Why did they stop him?— for reasons that are very clear. The bosses owned the distributorship over in Glasgow. The bosses were in the wrong spot, because they went to Switzerland for tax reasons, English taxes he told you were a little rough. But they were in the wrong spot. And this huge company winds up in Glasgow when Aberdeen becomes a boom town."
[*Id.* at 32.]
"As I said yesterday, does Macy's tell Gimbel's?
. . . .
So what happens? Keeney at this point is a price competitor to Mr. Lennon. He doesn't know where the bosses are involved."
[*Id.* at 33–34.]
". . . [H]e would have been a little more careful about it if he knew the bosses owned the shipments over in Glasgow, and they were trying to, serving these two young Scots for awhile and then cutting them off, in early 1978.

the parties, prior to argument, against this very sort of improper summation, and admonished counsel to the same effect during summation.[5]

> So into this breach comes this rich, spoiled young man, working 14 and 15 hours a day, everybody should be rich and spoiled like that.
>
> And he becomes an effective discounting competitor."
>
> [*Id.* at 34–35.]
>
> "We know he has them beat on price, because in 1977, he makes a comparison between a price list of Glasgow's and what he was buying the same product from Mr. Jennings in Louisiana; he says that comparison showed a price differential of 50 to 70 percent; talk about monopoly pricing..."
>
> [*Id.* at 35–36.]
>
> "Does this sound like a boycott to you...?"
>
> [*Id.* at 40.]
>
> "One letter. Here are three separate entities, Crawford in Cleveland, the man in Houston, the man in New Orleans; that combination evidencing the obvious agreement, saying that the refusal to sell was based upon this concert of action by three people, collaboration...."
>
> "I wish to God that every victim of a monopolistic practice had that kind of evidence to start out with.... It is just from this exterior evidence we have to fight our way through the secret councils of these monopolistic combines...."
>
> [*Id.* at 45–46.]
>
> "Who says in the United States of America, under a Constitution, that somebody has to go, a couple of thousand miles away from his home town and get a moonlighting cousin, who is working in the swing shift in an apprentice shop, to go buy your goods for you. Who says that is the way you are supposed to do business in the United States of America?"
>
> [*Id.* at 52–53.]
>
> "There is greed in this case, all those motivations, greed, cartel, keep the price above 50 to 70 percent of what he could buy it for in New Orleans in an oil exploration area. You know why they got so excited about this thing, he was forcing them to lower their prices."
>
> [*Id.* at 59.]
>
> "You put the two together and what is the truth. The truth is they did discuss cutting off Keeney. The truth is Callahan did recommend cutting off Keeney, and his recommendation is like a great order."
>
> [*Id.* at 61.]
>
> "You know the Constitution of the United States says every citizen has a right to petition the courts; and if that right is abridged by these huge companies being able to come in and collect a million and a half dollars, because these folks availed themselves of the right to go to court, which they have a right to do, a right to do, if that is ever abridged, nobody is going to have a right to get into these courts. They are going to be frightened about getting into these courts.
>
> . . . .
>
> Don't close the door, even to rich, spoiled young men, who don't marry the boss' niece. Even to rich, spoiled young men don't close their door if they want to compete, pay their money. The antitrust laws have been described as our charter of freedom, the arts of business, what the Constitution, the bill of rights is to everything else. This is an attempt by the cartels, the monopolies, to throttle, to destroy the willingness of people to take their chances and compete on the merits."
>
> [*Id.* at 62–63.]

5. The following excerpt from the transcript of counsel's summation demonstrates that plaintiff's counsel refused to heed this court's ruling that he desist in his references to the antitrust claims, misstated the counterclaim issues as being one issue—whether the Keeneys believed in their antitrust lawsuit—and unfortunately injected his personal belief in plaintiff's suit. *See Draper v. Airco, Inc.,* 580 F.2d 91, 95–96 & n. 4 (3d Cir.1978) (quoting American Bar Association Disciplinary Rule 7–106(C)(4)).

> "MR. ALIOTO:
>
> "Now you only decide the issues today of whether or not there is substance to this lawsuit, nothing more. We are sorry you aren't deciding the rest but in our judicial process that matter is going to be addressed now to an Appellate Court which we have been denied our right to a—"
>
> "JUDGE PALMIERI:
>
> "I must interrupt you, that remark is entirely out of order and I ask the jury to disregard it. It is entirely out of order for you to make any reference to my rulings and to the appellate process. You have been permitted to address this jury on the counterclaim and nothing else."
>
> "MR. ALIOTO:
>
> "Can I even tell them that matter is still in litigation.
>
> I just want to say this much, we say this lawsuit has substance, we believe in it, we have fought it out here, and we are going to fight it out in the appellate courts and the Supreme Court if we have to. It is not the first time or the last time that we have to do that."
>
> "JUDGE PALMIERI:
>
> "Ladies and Gentlemen, whatever Mr. Alioto tells you about the suit is irrelevant to the issues before you. The issue that you have to decide is an issue entirely separate from and distinct from his claims of cartel, monopoly, and all the other claims that he has made under the antitrust law.

Additionally, plaintiff's counsel repeatedly characterized defendants and their actions in terms wholly unsupported by the record, and in a manner prejudicial to defendants. Defendants were repeatedly referred to, explicitly and implicitly, in terms connoting unsavory and illegal characteristics: "monopolists," "world-wide cartels," "conspiracies," "dominant" "powerful" and "huge company," "this Cleveland group of companies," "bosses," "the head man from Cleveland," and "secret councils of these monopolistic combines." Defendants were also repeatedly charged with having engaged in various activities wholly unsupported by any evidence in the record: seeking to "crush a little company," "to monopolize the market in the North Sea," "this is the way monopolists always act," "surveillance, espionage, spying on this young man," "boycott," "monopoly pricing," pressing a "sham counterclaim," "tackl[ing Keeney] from the sidelines illegally," possessing "arrogance of power," engaging in an "attempt to buy off the antitrust claim, to buy time so [as to] proceed at their leisure to throttle this young company," and "cutting off Keeney." These were harsh words having little or no justification in the record.

This court, however, must consider these improprieties in the light of several countervailing circumstances. First, this court carefully instructed the jury, during trial and after summation, to disregard such potentially prejudicial statements as defendants herein contest.[6] This court believes

---

"Now, of course, I don't need to say anything more except I do not want the issues before you to be confused and confounded with something that has been removed from your consideration."

"MR. ALIOTO:

"I simply want to say to you that the Keeneys believe in this suit and that I believe in this suit, and we are going to see it through. That is all I want to say to you. That is germane to your issue as to whether or not this is a phoney suit brought for ulterior purposes. I assure you they were different." [*Id.* at 37–38.]

6. This court instructed the jury:

"... . Don't be at all impressed by the fact that at times the attorneys have had little clashes and sometimes they have had little clashes with me, that is par for the course, as the expression goes.

Our system of justice is based upon the adversary principle in which each side has the right to present its relevant evidence and make appropriate arguments.

... .

But in the end you must be careful that your attention must be devoted exclusively to the evidence, the testimony of witnesses, the exhibits, any stipulations that counsel may have made and nothing else, because we, the lawyers and I, will have completed our functions once you retire for the jury room.

... . You will be exclusive judges of the facts. It is you and you alone who determine where the truth lies, and you and you alone who attribute to that truth the probative value which you think it deserves.

... .

At any rate, the important thing to remember is that to the extent that you use any recollection that is yours that controls to the exclusion of mine and to the exclusion of the lawyer's recollection, you should decide the case without fear, favor or prejudice as you are sworn to do only on the admissible evidence and subject to the law as I charge you.

Remember, too, that although the lawyers perform a very important function in the case, they are the spokesmen for their clients; they act as the leading wedge for the partisan interest of their clients; nevertheless, they are not witnesses. They cannot give you testimony. What a lawyer says may be important in helping you to understand the evidence and helping you to focus on some aspect of the case may be important, but he is there as a partisan and as a guide, both, but never as a witness.

... .

You have got to be very careful not to accept those statements of counsel as though they were part of the record. They are not part of the admissible proof. They were merely means of eliciting admissible proof. If a question is combined with an answer, that can give you some testimony. But a question standing alone, or a statement made by counsel itself does not constitute evidence in the case.

Remember that the substance of the antitrust claims about which you heard so much testimony is not before you any longer. You are not being asked to decide any issues pertaining to the antitrust claims in this case. I will have more to say about what Mr. Alioto said concerning his desire to appeal and so forth; that is his right and his privilege. But for the time being, remember that you are not here to adjudicate any rights on the part of some alleged victim of some alleged cartel and so forth.

You have heard a lot about it in the summation of Mr. Alioto, but to the extent that

that its curative instructions after counsel's summations, were sufficient to neutralize any irrelevant, unsupported or prejudicial statements of counsel.

■ Second, defense counsel had an opportunity to address plaintiff's counsel's summation on rebuttal. While it is clearly preferable that improper statements should be prevented altogether, the prejudicial force of such statements may be counterbalanced by effective rebuttal. This court believes that defense counsel effectively highlighted and refuted the improper impressions evoked by plaintiff's counsel's summation.

Finally, this court is persuaded that the factual setting of the immediate case was not a particularly conducive one for inflammatory or emotional appeals to take root. Unlike such cases as *Edward v. Sears, Roebuck & Co.,* 512 F.2d 276 (5th Cir.1975) and *Draper v. Airco, Inc.,* 580 F.2d 91 (3d Cir. 1978), which are cited by counsel for defendants-counterclaimants, this case does not involve claims of liability for personal injury or death—claims which lend themselves to appeals of sympathy and impassioned pleas such as pitting "helpless widows and orphans" against relatively wealthy corporations. This case involved multimillion dollar claims of corporations against one another for alleged damages occasioned by their business activities. None of the individuals involved were poor. On the contrary, the evidence indicated they were all highly successful, intelligent businessmen. None of the individuals in the suit were claiming anything like personal injuries with the emotional overtones which they engender.

The court's charge was delivered immediately after the summations and was completed before the lunchtime recess. The jury spent the remainder of the day and most of the following day in their deliberations. During that time they put a number of questions to the court and asked to hear the testimony of the attorney witnesses Messrs. Fishman and Schaub which was read to them. The testimony of Messrs.

you may be thinking of vindicating any antitrust rights, that is completely extraneous to your function in this posture of the case.

I told you at the outset that we like to think of a trial as a conscientious search for the truth. That is what we are really trying to do. Your verdict, when you leave the courthouse today, should leave you with an abiding assurance that your verdict is based on the truth as you found it, subject to the law as I charged it. If that is the case, then justice will have been done. If that is not the case, then something else has happened. A case should never be a battle of wits, a contest in salesmanship, or a debate, a contest in eloquence, it is none of that.

Some of those aspects of the case unfortunately do creep in, but when all is said and done, you must be careful to shield yourself against any temptation to do anything other than to find the truth on the basis of the admissible evidence and so see to it that that verdict represents your finding of the truth and the admissible evidence subject to the law as I charge you.

....

I regretted Mr. Alioto talked about how much he believes in his case and how hard he is going to fight up to the Supreme Court and the appellate process. That is extraneous to the jury function. His beliefs are not an issue before you and the appellate process that may be pursued by his clients are extraneous to that function. But since this matter has been mentioned, I feel constrained to advise you, as I advised the attorneys yesterday at a formal court session, that in the event you award any damages on this counterclaim, there will be no effective judgment based on those damages until the very last Appellate Court has said the very last word on the antitrust claims made by Gibbons.

In other words, to use the legal terms, I will stay enforcement of any judgment entered on any verdict awarding damages until such time, if that time ever comes, when the last Appellate Court has confirmed the invalidity of Gibbons' antitrust claims.

Now what this means is that there is an absolute predicate, a precondition to any effective recovery of damages by Crawford, Capital and Read on this counterclaim. And that is that Gibbons has brought a baseless lawsuit against them. We won't know for sure whether that suit was legally insufficient until the last Appellate Court has spoken, and that is why there will be no judgment enforced on any verdict you may render until some future day, whenever that day occurs, if it occurs.

In short, there has to be a final determination of the antitrust suit in favor of Crawford, Capital and Read before they can recover on this counterclaim."

*Proceedings of November 17, 1981,* Charge to Jury, at 86–92, 114–16.

Fishman and Schaub was highly relevant to the issues of full disclosure and good faith posed by the first of the special interrogatories. Additionally, among the questions they put to the court were two requesting definitions of good faith. Thus, the jury manifested a conscientious discharge of its duties and impressed the court with its deliberateness and circumspection.

While plaintiff's counsel often departed from the record and made repeated appeals to passion and prejudice, this court believes his remarks were sufficiently defused by the rebuttal of opposing counsel and by the court's charge which followed.

Defendants' motions for judgment notwithstanding the verdict or, in the alternative, for new trial on defendants' counterclaim against plaintiff, are denied.