NATIONAL AUTO BROKERS CORP., Frank Maiorana, Anthony Maiorana, General Auto Sales & Leasing, Inc., Dale Strimple, Ralph Ajello, as Administrator of the Estate of E. Louis Jamele, Deceased, Nabcor of East New York, Inc., and Alfred J. Young, Sr. d/b/a A. J. Young, Sr. Auto Sales, Plaintiffs-Appellants,

v.

GENERAL MOTORS CORPORATION, Frederic G. Donner, James M. Roche, Bob Bain Chevrolet, Paul Batt Buick, Inc., Glen Campbell Chevrolet, Inc., Hamister-Gillogly Chevrolet, Inc., Paragon Oldsmobile, Inc., Niagara Frontier Automobile Dealers Association, Inc., and General Motors Acceptance Corporation, Defendants-Appellees.

No. 160, Docket 77–7037.

United States Court of Appeals,
Second Circuit.

Argued Dec. 5, 1977.

Decided March 20, 1978.

Carl E. Person, New York City, for plaintiffs-appellants.

Martin Kleinbard, Lewis A. Kaplan, New York City (Moses Silverman, Howard S. Veisz, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for defendants-appellees General Motors Corp. and General Motors Acceptance Corp.

Ellis, Kustell & Mullenhoff, Buffalo, N. Y. (Carl B. Kustell, Buffalo, N. Y., of counsel), for defendant-appellee Bob Bain Chevrolet.

Borins, Halpern, Setel, Snitzer, Levy, Yellen & Fradin, P. C., Buffalo, N. Y. (Isadore Snitzer, Buffalo, N. Y., of counsel), for defendant-appellee Glen Campbell Chevrolet, Inc.

Watson, McGarvey, Hetzelt & Bennett, Buffalo, N. Y. (Joseph L. Watson, Buffalo, N. Y., of counsel), for defendants-appellees Gillogly Chevrolet, Inc. and Niagara Frontier Auto. Dealers Assn.

Lipkin & Weisberg, New York City (Sidney A. Weisberg, New York City, of counsel), for defendant-appellee Paragon Oldsmobile, Inc.

Brennan, Tesseyman, Zelman, Runfola & Brownstein, Buffalo, N. Y. (Ross L. Runfola, Buffalo, N. Y., of counsel), for defendant-appellee Paul Batt Buick, Inc.

Before MOORE, SMITH * and MANSFIELD, Circuit Judges.

* Judge Smith having requested that he be relieved of any consideration of this appeal, this decision is rendered solely by Judges Moore and Mansfield, who are in agreement, pursuant to the Rules of this Court, § 0.14(b).

MANSFIELD, Circuit Judge:

This case demonstrates that unsound ideas cannot be turned into a profit through frivolous antitrust claims and costly litigation. National Auto Brokers Corporation (Nabcor) and several of its affiliates[1] appeal from a judgment of the Southern District of New York dismissing their antitrust suit for $3.6 billion against General Motors (GM) and others,[2] following a directed verdict at the close of the plaintiffs' case, which was tried for more than six weeks before Judge Thomas P. Griesa and a jury.

The action was commenced in 1970 against some 63 defendants, including GM and various other major auto manufacturers, banks, auto dealers, Better Business Bureaus, and individuals, by the filing of a 93-page complaint charging a conspiracy in violation of the antitrust laws, including § 1 of the Sherman Act, to hamper Nabcor's efforts to obtain new automobiles for resale, and to restrain its competition in the sale of such cars.[3] As a result of severances, this part of the case was tried only against GM and those defendants connected with or franchised by it. We have reviewed the lengthy trial record and agree with the court below that the plaintiffs failed completely to make out a prima facie case. Accordingly, we affirm the judgment of the district court, essentially for the reasons

stated in Judge Griesa's thorough, well-reasoned opinion, 1976-2 Trade Cas. (CCH) ¶ 61,211. Because no purpose would be served by repeating his careful analysis of the evidence, we limit ourselves to a general outline with particular reference to the gross inadequacies in the proof which mandated dismissal.

The case arises out of the unsuccessful efforts of Nabcor, beginning in 1966, to compete with manufacturer-franchised automobile dealers in the sale of new cars by itself franchising individual "brokers" to sell cars to the public. The brokers were to solicit new car orders and forward them to Nabcor. Nabcor, headed by appellants Frank and Anthony Maiorana, was to provide administrative services and cars needed by the brokers to fill their orders.[4] The scheme was predicated on the theory that since the brokers would not be selling out of showrooms, maintaining inventories or providing repair services, their overhead would be low or virtually non-existent, enabling them to undercut manufacturer-franchised dealers and thus attract a large volume of retail purchasers. Nabcor planned to fill its brokers' orders by purchasing cars as needed from regular manufacturer-franchised dealers. It expected that the prospects of high volume would induce these dealers to part with their cars at a small markup óver

1. In addition to Nabcor the appellants are (1) Frank Maiorana, its president and a principal shareholder; (2) Anthony Maiorana, vice president of Nabcor and a principal shareholder; (3) Alfred J. Young, Sr., a Nabcor broker; (4) Ralph Ajello, administrator of E. Louis Jamele, also a broker; and (5) Nabcor of East New York, Inc., a Nabcor "master broker." Dale Strimple and his corporation, General Auto Sales & Leasing, Inc., a master broker, have stipulated to the dismissal of their appeals. Given our disposition of this case, we need not decide which of the above parties have standing under § 4 of the Clayton Act, 15 U.S.C. § 15, to bring this action. See generally *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183 (2d Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971).

2. In addition to GM the appellees are (1) a subsidiary, General Motors Acceptance Corp.; (2) high-level GM officials Frederic G. Donner and James M. Roche; (3) a number of franchised GM dealers, Bob Bain Chevrolet, Paul Batt Buick, Inc., Glen Campbell Chevrolet, Inc.,

Hamister-Gillogly Chevrolet, Inc., and Paragon Oldsmobile, Inc.; and (4) an organization of dealers, the Niagara Frontier Automobile Dealers Association, Inc.

3. Originally, this suit was brought as a class action. Judge Griesa has since denied the suit class action status and has severed it into four parts. The subject of this appeal, the case involving the GM-related defendants, is the first of the four to go to trial.

4. When Nabcor first went into business, its system consisted of two levels—Nabcor itself and its brokers. Later, however, Nabcor reorganized and began selling intermediate "master broker" and "area broker" franchises as well. Master brokers were assigned some of the responsibility for procuring cars. In order to simplify our discussion, we will not distinguish between Nabcor and its higher-level franchises unless the distinction is relevant to the issues being discussed.

their cost, which would enable Nabcor and its brokers to realize profits while undercutting the very dealers from whom the cars would be acquired.

The scheme proved a complete failure. Although Nabcor franchised approximately 145 brokers, from whom it received substantial cash payments, they failed to generate any significant number of new car orders. In four years the brokers submitted only 677 orders for GM cars. On December 10, 1970, this suit was instituted, seeking to shift the blame for appellants' failure to the defendants on antitrust law grounds.

Appellants first contend that beginning in 1966 GM conspired with its independent franchised dealers to impede Nabcor's efforts to obtain from the dealers GM cars for its brokers; the parties have referred to this aspect of the case as the "blacklist theory." Second, they assert that GM maintained an illegal "whitelist" under which it made quantities of cars—so-called "fleet allotments"—available to some favored high-volume customers (i. e., purchasers of 10, 20, or more cars for their own use, such as car leasing and rental companies) but not to Nabcor. The remaining individual appellants, the Maioranas and several brokers, seek damages allegedly resulting from the "blacklist" and "whitelist"—including compensation for their efforts in promoting Nabcor's operations and lost profits.

■ Upon this review, since the case is before us on appeal from a directed verdict, F.R.Civ.P. 50(a), all issues of credibility must be resolved in favor of appellants, *Brady v. Southern Ry. Co.*, 320 U.S. 476, 479–80, 64 S.Ct. 232, 88 L.Ed. 239 (1943). At the same time, we need not overlook uncontradicted evidence unfavorable to appellants.

"If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury." *Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 742–43 (2d Cir. 1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976), quoting *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969).

Turning first to appellants' boycott claim, the record, which includes Nabcor's books, publications and the testimony of its president, reveals clearly that Nabcor received substantially all of the GM automobiles it ordered during the relevant period (from December 1966 to December 1970) and that it had no unusual difficulty in obtaining GM automobiles for delivery to its brokers. Of approximately 553 GM cars ordered by Nabcor from GM dealers during this period, from which some 81 may be deductible for cancellations and a certain Cadillac order claimed to have been placed in 1966, it received a minimum of 435 and a maximum of 503 cars. Indeed, during the last 3½ years of the relevant period it failed to receive only two GM vehicles, neither of which failure appears to be relied upon by appellants as proof of the alleged conspiracy.[5] Nabcor published a statement in 1969

---

5. Two key exhibits bearing on the boycott issues are PX 450, which attempts to trace Nabcor's orders based on its order log, and PX 699, which summarizes the alleged refusals to deal with Nabcor and problems with deliveries that Nabcor claimed were the result of a boycott. PX 699, which summarized the alleged refusals to deal with Nabcor, indicates only two unexplained unfilled orders after June 1, 1967. It was during this later period that some GM employees allegedly made their hostile statements in the presence of the Maioranas.

 Nabcor contended that in the fall of 1966 it received orders for forty-five 1967 Cadillacs, and placed forty-three of the orders with Colonial Cadillac of Trenton, N. J. Two witnesses from Colonial Cadillac denied any knowledge of the orders and its records show no such orders. Nabcor, moreover, had no record of any such orders.

and 1970 that it had "experienced no difficulty in supplying its brokers with automobiles, nor does it anticipate any difficulty in the future." Its president testified that if purchases from one GM dealer were terminated, it "could always get another dealer . . . could always get a source of supply if it were stopped at one particular place." Nabcor further represented in a 1968 publication that it was "not only welcomed by a majority of the rapidly growing auto-buying public but by manufacturers as well. . . . " Moreover, most GM-franchised dealers who were called as witnesses by Nabcor testified that they had not refused to sell GM cars to it. Although a few dealers had refused to do so, Nabcor was always able to obtain alternative sources of supply. The record reveals no substantial evidence, direct or circumstantial, that the refusals on the part of a few dealers to sell GM cars to Nabcor were directed, inspired, participated in, or approved by GM [6] or any of the other appellees.[7]

Turning to Nabcor's contention that GM refused to permit dealers to sell cars to Nabcor out of their fleet allotments, there likewise is no substantial supporting proof. Although the details of the "fleet allotment" system varied somewhat among GM's various divisions, each appears to have made an effort to allocate its production among the many independent GM dealers in order to assure that if shortages in new cars should ever develop, the supply would be spread equitably. With regard to sales to the general public, each GM dealer was assured access to a certain minimum number of cars for retail sales. At the same time, GM set aside some percentage of its production—the "fleet allotments"—for sale to large purchasers of cars for their own use (e. g., car rental companies). By securing a fleet allotment for a large order of cars, a dealer could avoid having to satisfy a bulk purchaser from stocks earmarked for individual consumers.

Since Nabcor was purchasing cars for resale rather than for its own use, it may not have qualified for access to fleet allotments. But regardless of whether it qualified, the record is barren of any evidence that Nabcor was unable to obtain any GM cars because of any dealer's inability to secure a fleet allotment for it from GM or that Nabcor experienced any unusual patterns of delay in obtaining delivery of cars, much less that any delays were attributable to fleet allotment problems. Thus, GM's fleet allotments turned out to be immaterial, primarily because of the absence of any shortage in supply of GM automobiles.

After five weeks of trial and at a point when the inadequacy of the plaintiffs' proof was rapidly becoming apparent, plaintiffs orally moved for a mistrial and to disqualify Judge Griesa, who under the individual assignment system had by that time been in

6. Appellants introduced evidence showing that high-level GM management was made aware of the activities of Nabcor, but did not offer any competent evidence demonstrating that any action was taken by GM to persuade dealers to refrain from dealing with Nabcor.

7. Appellants presented some evidence that was admissible against some of the dealer appellees, but not against GM, with a view to showing that the dealers had conspired against Nabcor. Nevertheless, appellants did not present a prima facie case even against these appellees.

First, Frank Maiorana testified that officials of appellee Paragon Oldsmobile told him that GM employees had instructed Paragon not to sell to Nabcor. However, even if Paragon's acquiescence in such an order was sufficient to make the dealer a conspirator, there was no evidence that Nabcor was injured as a result; uncontradicted evidence indicates that it never had difficulty obtaining Oldsmobiles from some source.

Second, regarding the Buffalo area, representatives of a Nabcor master broker, General Auto Sales & Leasing Co., recounted hearsay statements suggesting that GM personnel and dealers were communicating their hostility to the Nabcor system to one another. In addition, an organization of Buffalo-area dealers, then known as the Buffalo Automobile Dealers Association, distributed a bulletin describing Nabcor in unfavorable terms and implying that dealers should not get involved with it. But Nabcor's success in purchasing cars in the Buffalo area would have precluded any reasonable jury from finding liability based on a dealer conspiracy. Moreover, General Auto Sales & Leasing has stipulated to the dismissal of its appeal from the judgment below and the remaining appellants have failed to show any injury resulting from these events.

charge of the case for some four years. The ground asserted was that he should have recused himself because the large law firm of which he had been a member prior to his appointment in June, 1972 (Davis Polk & Wardwell) had represented General Motors in matters wholly unrelated to the subject matter of this case. The motion was denied on November 23, 1976, by Judge Griesa, who stated that except for working on an opinion letter involving GM, which had nothing even remotely to do with the litigation before him, he had never been involved in the representation of GM in any way. No affidavit in support of the motion, as required by 28 U.S.C. § 144,[8] was filed until six days later. It alleged in addition that certain of Judge Griesa's rulings and statements had indicated bias.

On December 6, 1976, after hearing five days of oral argument, Judge Griesa granted the defendants' motion for a directed verdict, rendering a lengthy oral opinion from the bench. Judgment dismissing the complaint as to appellees was entered on December 16, 1976.

## DISCUSSION

Turning first to appellants' claim that Judge Griesa should have disqualified himself, their motion and affidavit were not only untimely but insufficient. The prior representation of a party by a judge or his firm with regard to a matter unrelated to litigation before him does not automatically require recusal, 28 U.S.C. § 455 (1970);[9] *Carr v. Fife*, 156 U.S. 494, 498, 15 S.Ct. 427, 39 L.Ed. 508 (1895); *Darlington v. Studebaker-Packard Corp.*, 261 F.2d 903, 906–07 (7th Cir.), *cert. denied*, 359 U.S. 922, 79 S.Ct. 1121, 3 L.Ed.2d 980 (1959); see *Laird v. Tatum*, 409 U.S. 824, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972) (Rehnquist, *J.*). Nothing about the Davis Polk firm's representation of GM in wholly unrelated matters suggests that Judge Griesa should have recused himself as a matter of discretion. Nor is there any indication that his actions on the bench in this case were the result of improper extra-judicial bias, *United States v. Haldeman*, 559 F.2d 31, 131–34 (D.C.Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

The mere filing of an affidavit of prejudice does not require a judge to recuse himself. On the contrary, we have held that a judge has an affirmative duty to inquire into the legal sufficiency of such an affidavit and not to disqualify himself unnecessarily, particularly "where the request for disqualification was not made at the threshold of the litigation and the judge has acquired a valuable background of experience." *Rosen v. Sugarman*, 357 F.2d 794, 797–98 (2d Cir. 1966). Here, the fact is that

---

**8.** This section provides:

> "Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

> "The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith."

**9.** The provision applicable to this action provides:

> "Any justice or judge of the United States shall disqualify himself in any case in which

he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein."

An amendment of § 455 applicable to cases filed on December 5, 1974 or thereafter, see Act of Dec. 5, 1974, Pub.L. 93–512, § 3, 88 Stat. 1610, makes it clear that disqualification is not required unless "in private practice [the judge] served as lawyer *in the matter in controversy*, or a lawyer with whom he previously practiced law served during such association as a lawyer *concerning the matter* . . . ." 28 U.S.C. § 455(b)(2) (Supp. V, 1975) (emphasis added). Even under the more stringent requirements of the current statute, therefore, the prior representations of GM by Davis Polk and Judge Griesa as to unrelated matters would not require him to recuse himself.

Judge Griesa's former membership in the Davis Polk firm had for years been a matter of public knowledge and that firm's representation of GM had been known to plaintiffs' counsel for months prior to trial. Under the circumstances Judge Griesa was duty bound to deny plaintiffs' frivolous motion for his disqualification.

 Turning to the merits, in order to make out a prima facie *per se* violation of § 1 of the Sherman Act, appellants assumed the burden of first introducing evidence from which a jury might reasonably infer that appellees had conspired to restrain sales to Nabcor, with resulting damage to it. See *United States v. General Motors*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Klor's Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). But there is an absence of any substantial evidence, direct or circumstantial, supporting these elements of appellants' claim. Appellants' own uncontradicted proof establishes that at all times, despite some refusals, there were many GM dealers willing to deal with Nabcor and that Nabcor was able to obtain from one dealer or another almost all of the GM cars it wanted. Moreover, there is no showing that it experienced delivery delays that were unusual in the automobile industry or indicative of a boycott or concerted refusal to deal. In light of these circumstances, the limited number of refusals by some dealers to fill Nabcor orders are insufficient to permit an inference of concerted action on the part of the appellees, the essential predicate of an antitrust conspiracy. See *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1042–43 (2d Cir. 1976), *cert. denied*, 429 U.S. 855, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976) ("At a minimum, [defendants'] actions, to support a finding of conspiracy, must suggest a commitment to a common end."). There is simply no basis for inferring that these few refusals were the result of any agreement or understanding with GM or other GM dealers, since the evidence is too consistent with independence of action to permit such an inference. On such a record a jury would not be entitled to find a conspiracy in violation of the antitrust laws.

Indeed, there were several good reasons why each dealer might have independently decided not to do business with Nabcor, as was the dealer's right, *United States v. Colgate*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). In the first place, Nabcor was seeking to purchase cars at such a small markup over the dealer's cost that the dealer might well conclude independently that sales to Nabcor would not be worthwhile from the dealer's own standpoint. Secondly, the dealer might also independently conclude that since Nabcor's purpose was to undercut the dealer in selling to the public, sales by the dealer to Nabcor would adversely affect the dealer's own more profitable retail sales. There were sufficient grounds for concern over Nabcor's solvency, reputation and responsibility. Lastly, a dealer might become apprehensive that the respectability of the market for new GM cars would suffer in the public's eyes as a result of Nabcor's practice of selling GM cars without providing service. As we pointed out in *Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co.*, 513 F.2d 102, 110 (2d Cir. 1975), discussing similar facts,

> "Such parallel conduct is consistent with independent competitive decisions or at most reflects a non-consensual decision not to compete. Additional facts or circumstances are needed to show that the decisions were interdependent and thus raise the inference of a tacit agreement to boycott."

By neglecting to present "additional facts or circumstances" tending to show that the actions of the GM dealers were interdependent or somehow concerted, appellants failed to raise their proof of a few individual refusals to deal to the level of a prima facie case of conspiracy.

The wide void in the circumstantial proof of conspiracy is not filled by the Maioranas' hearsay testimony regarding statements unfavorable to Nabcor that were attributed to GM employees. No GM employee is quoted as ever having admitted participa-

tion by GM in any conspiracy. Moreover, such unfavorable hearsay comments regarding Nabcor occurred when it was not having any difficulty obtaining all the GM cars it ordered. Nor is there any indication that the statements reflected the views of GM officials in a position to direct a boycott. Lastly, there is no evidence that the hearsay statements were implemented.

 In short, appellants' proof of conspiracy was so utterly insubstantial as to preclude any jury from reasonably finding that any of the appellees had combined or agreed to prevent Nabcor from obtaining GM automobiles. Moreover, to the extent that appellants' case is based on a GM "whitelist" allotment theory it is defective for failure to show that the fleet allotment system violated the rule of reason, as required by the Supreme Court's recent decision in *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977),[10] which held that such non-price vertical restraints are no longer *per se* illegal, thus overruling in this respect its earlier holding in *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), upon which appellants relied below.[11] Consequently, it was appellants' burden, e. g., *Schwinn, supra*, 388 U.S. at 374 n.5, 87 S.Ct. 1856; *Evans v. S.S. Kresge Co.*, 544 F.2d 1184, 1193–94 (3d Cir. 1976), *cert. denied*, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977), to show that GM's distribution system was unreasonable in view of "the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable." *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed.

683 (1918). The record in this case is bare of facts enabling a jury to conclude that the GM system of allotments was unreasonable.

Thus appellants' claims were properly dismissed for failure to adduce evidence that would permit a jury to find a combination of conspiracy between any of the appellees, that appellants were injured by the alleged boycott or GM distribution system, or that the fleet allotment system was an unreasonable restraint in violation of the Sherman Act.

The decision of the court below is affirmed.[12]

10. Appellants attempt to characterize GM's allotment system as a restraint on resale prices. However, there was no evidence suggesting that this system was intended to control prices or that it had any such effect. To the contrary, it appears that GM dealers were free to set the prices of cars they purchased from GM.

11. Although *Continental T.V., Inc., supra*, was not decided by the supreme court until after the conclusion of trial of the present case, we

are bound to apply its principles rather than the earlier *per se* rule of *Schwinn*. See *Cort v. Ash*, 422 U.S. 66, 74–77, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

12. We have carefully considered appellants' contention that Judge Griesa improperly denied them answers to their so-called "communications interrogatories" and find it to be completely without merit.