CENTURY AIR FREIGHT,
INC., Plaintiff,

v.

AMERICAN AIRLINES, INC.,
Defendant.

No. 77 Civ. 2195–CLB.

United States District Court,
S.D. New York.

Jan. 5, 1984.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

By motions argued on September 9, 1983 and fully submitted on September 23, 1983, plaintiff seeks partial summary judgment, while defendant seeks an order dismissing certain claims pleaded, and granting summary judgment in its favor with respect to others.

This action was stayed for a time pending application by plaintiff to the Civil Aeronautics Board ("CAB") for administrative relief upon some but not all of the claims. These administrative proceedings

have been concluded.[1] There remains for adjudication here Federal Aviation Act claims and antitrust claims pleaded, which were not resolved by the administrative proceedings and subsequent appellate review thereof.

Except where noted, the facts stated below are not controverted, or may be regarded as conceded solely for purposes of the motions. Defendant American Airlines, Inc. ("American") is a direct air carrier of freight and passengers. Plaintiff Century Air Freight, Inc. ("Century") is a licensed air freight forwarder, authorized to engage in that activity by the CAB, as are many others.

In January 1970, American acquired Trans-Caribbean Airways, and as part of that acquisition assumed its carriage of air freight between New York City and San Juan, Puerto Rico. On March 1, 1971, subsequent to that acquisition, American initiated Flight 841, a weekday all-cargo flight from New York City to San Juan. The dispute herein arises out of the subsequent allocation by American of main deck container positions on that flight.

Affiliated interests of the plaintiff apparently had prior commercial disputes, litigation and arbitration with American totally unrelated to this action or the dispute set forth below. Plaintiff suggests, and we infer, that these disputes left a residue of ill will. In addition, in February 1970, while Century's application for a license from the CAB was pending, the president of a competing licensed air freight forwarder, Profit-By-Air, Inc. ("PBA"), wrote a derogatory letter to the CAB concerning plaintiff, referred to as a "devastatingly effective poison pen job on Century Air Freight." Plaintiff's Memorandum at 1. There is no showing that this letter reached American, or that American shares any responsibility for it. Nevertheless, in June 1971 Century's freight forwarding license was granted by the CAB.

American Flight No. 841, during the period of its existence, from March 1, 1971 to August 31, 1981, had a scheduled departure from New York which varied between 11:00 P.M. and Midnight, with the return flight from San Juan, American Flight No. 840, scheduled for departure in the early morning immediately following discharge of cargo and reloading. The capacity of the Boeing 707 aircraft operated by American on these flights was as follows: (1) eleven, unbroken standard "A" type freight containers on the main deck of the aircraft; (2) the cubic equivalent in breakbulk form, of one additional "A" type container on the main deck; (3) two specially contoured containers each with the cubic capacity of an "A" type container in the tail section; (4) the cubic equivalent of three "A" type containers of breakbulk cargo in the cargo bay compartments of the aircraft. An "A" type container has a capacity of approximately 5,500 lbs., and contains 440 cubic feet.

American allocated the space for the twelve main deck container positions by a

---

**1.** In response to American's motion for dismissal on grounds of primary jurisdiction, Century stipulated to referral to the CAB of so much of the action as was within its jurisdiction, and a stay of all other proceedings in this Court. On December 14, 1979, the CAB's Bureau of Consumer Protection instituted enforcement proceedings alleging that American's allocation practices on Flight 841 violated § 404(b) of the Federal Aviation Act. American denied any violation. Thereafter, on August 18, 1980, American and the CAB reached agreement, prior to any hearing, on a consent order disposing of the Bureau's complaint, providing for the payment by American of $50,000 in civil penalties, and establishing a new allocation system, subject to annual reassessment, whereby American guaranteed that one "A" type container would be available on Flight 841 to any shipper which regularly used the equivalent of such a container on the northbound Flight 840. The settlement expressly excluded any consideration of anti-trust claims against American, nor did it, quite properly, address itself to the availability of private damage actions under § 404. Century opposed the settlement, but its objections were rejected by the CAB and the Court of Appeals, *Century Air Freight Inc. v. Civil Aeronautics Board*, 679 F.2d 261 (D.C.Cir.1982). Century's petition for certiorari was denied by the United States Supreme Court on October 18, 1982, 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982). On April 25, 1983, Century requested that this action be removed from our Suspense Docket and reactivated.

"Confirmed Air Freight" method, whereby there was an understanding between American and various shippers and/or forwarders, to the effect that specific numbers of container positions regularly would be available and be used by them on Flight 841. Recurring daily reservations were offered and maintained, conditional upon continuous use of the amount of space reserved by the shipper. Initially, American made offers in part on the basis of the shipper's demand for container space on the return flight, Flight 840, which was less lucrative because less air cargo moves in that direction.

According to American, the recurring daily reservations were granted initially in March 1971 on a first-come-first-served basis, and such reserved space did not become fully committed until the end of 1971. By that time, American had allocated eight main deck container positions to PBA, three to Shulman Air Freight, Inc. ("Shulman") and one to Emery Air Freight, Inc. ("Emery"). These allocations were in effect until 1978.

American asserts that on several occasions during 1971, before the main deck container positions were fully reserved, it offered Century confirmed air space on Flight 841, but that Century declined the offers, "apparently because [Century] believed it had preferable [space] from other carriers." (Affidavit of George A. Shipman, sworn to August 10, 1983, ¶ 11 ["Shipman Affidavit"]). Specifically, it is contended that Century contemporaneously held confirmed air freight space for six to eight "LD-3" type container positions on a late night Eastern Airlines combination passenger/freight flight from New York to San Juan. (Shipman Affidavit, ¶ 13).

American asserts further that Century's requests for specific space on particular dates on Flight 841 were granted or denied solely on the basis of the availability of space on the particular dates requested. It also contends that in January 1973 Century was given a reserved space for one hundred pounds of cargo, and that in September 1977, after the commencement of this action, American accorded Century a recurring reservation for a weight volume allocation on Flight 841 equivalent to one "A" type container. American did not confirm, however, that the Century freight would move in a container rather than as breakbulk cargo. Finally, American asserts that in 1978 when Shulman abandoned its three reserved container positions, these were filled based upon the requests of at least seven shippers, and that the three shippers granted the space had previously been without any reserved space on Flight 841.

Century contests the foregoing interpretation of events, and asserts that from the time it was first licensed as an air freight forwarder in June 1971, American never offered it any main deck container positions on Flight 841, and that in fact Century's repeated requests for reserved space were denied consistently. (Affidavit of Salvatore Cirami, sworn to July 2, 1983, ¶ 14 ["Cirami Affidavit"]). It asserts further that its constant requests for confirmed space in main deck container positions were prompted by necessity, because Flight 841 was the only daily all cargo flight between New York and San Juan during the relevant time period with reliable next day delivery service. (*Id.* at ¶ 15).

While Century does not contest directly that it had confirmed space on an Eastern Airlines combination passenger/freight flight, it does contend that the space on alternatives to Flight 841 was commercially unacceptable because the "LD-3" type containers on such combination flights had only one-third the capacity of the "A" type containers used on the American flight, and because the departure times of the alternative flights were "inconvenient" for loading in New York and ultimate delivery in Puerto Rico. (Reply Affidavit of Salvatore Cirami, sworn to August 24, 1983, ¶ 21). Century also contends that the offer of 100 pounds reserved space, made by American in April 1973 was commercially insignificant, and that the instant litigation was the sole reason for American's September 1977 offer of the equivalent of one "A" type container space.

On the basis of the foregoing facts, Century alleges that American, in conspiracy with PBA, refused, wrongfully, to deal with it with respect to reserved air freight space on Flight 841 in violation of § 404 of the Federal Aviation Act, 49 U.S.C. § 1374, and sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. American responds, as it did in the substantial correspondence between the parties (see Plaintiff's Exhibit 9), that it did not exclude Century from Flight 841 wrongfully, but rather that its reserved space allocation method or system was commercially necessary to assure the continued existence of the flight, and that, therefore, American could not reasonably cancel the existing continuous reservations of PBA, Shulman and Emery solely for the benefit of the plaintiff.

### Federal Aviation Act Claim

Century alleges that American's refusal to accord it reserved main deck container positions on Flight 841 violates § 404 of the Federal Aviation Act, entitling it to damages on its motion for summary judgment. American, in its motion, seeks to dismiss under Rule 12(b)(6), F.R.Civ.P. so much of the complaint, filed May 5, 1977, as is based on the § 404 claim, on the grounds that Century has no implied private right of action for damages under that statute. In addition, in opposing Century's motion for summary judgment, American argues that even if there is an implied right of action under § 404, the plaintiff's motion should not be granted because questions of fact remain as to whether (1) American discriminated against Century in assigning reserved space; (2) Century requested reserved air freight under similar circumstances as those who were granted main deck container positions; (3) the allocation system resulted in any injury to competition in the relevant market; (4) the challenged allocation method was commercially reasonable because necessary to sustain Flight 841; (5) the challenged practice was necessary to meet competition from other direct carriers of air freight between New York and San Juan.

■ It is unnecessary to consider whether the aforementioned issues of fact are material and genuinely in dispute, because this Court agrees with defendant that an air freight forwarder has no implied private right of action for damages against an air carrier under § 404 of the Federal Aviation Act.

Section 404(a)(1) provides in pertinent part that every air carrier has the duty, with respect to interstate and overseas air transportation, to "establish, observe and enforce ... just and reasonable classifications, rules, regulations, and practices relating to such air transportation." Section 404(b) provides that an air carrier may not make any "unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever" with regard to any person. A fair reading of Century's papers indicates that it premises its complaint and its motion for partial summary judgment upon both of these provisions.

There is no express statutory authority for a private right of action under either of these subdivisions, therefore, the question of whether an implied right of action is appropriate must be considered. American asserts, and Century has not disputed, that heretofore no court has ever implied such a right under § 404(a). Moreover, defendant contends that no court has ever implied a right under § 404(b) on the part of an air freight forwarder.

■ Prior to the Supreme Court's decision in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), a private remedy was readily presumed in favor of one specially injured by the violation of a regulatory statute. However, in *Cort, supra*, such presumptions were rejected, and a four part test was devised to determine whether Congress had actually intended to create a private right of action in favor of the particular plaintiff seeking to assert that right. 422 U.S. at 78, 95 S.Ct. at 2088. The four factors are (1) whether the plaintiff is a member of a class for whose "especial benefit" the statute was enacted; (2) whether there is any indication of legisla-

tive intent to create or deny the remedy sought; (3) whether the implication of the right of action would be consistent with the underlying purposes of the regulatory scheme involved; and (4) whether the cause of action sought is one traditionally reserved to the states. *Id.*

In an effort to cram the genie back into the bottle, and stem the overwhelming flow of federal civil litigation spawned by *J.I. Case v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), which *Cort v. Ash* did not succeed in doing, this test has been narrowed further in subsequent decisions, which emphasize the need to find affirmative expressions of Congressional intent before implying a right of action. *E.g., Middlesex County Sewerage Authority v. National Sea Clammers Ass'n.,* 453 U.S. 1, 13, 101 S.Ct. 2615, 2622–23, 69 L.Ed.2d 435 (1981) (legislative intent is the "key to the inquiry"); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979) (all considerations should be subordinated to the determination of Congressional intent); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 20, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), *quoting Cannon v. University of Chicago,* 441 U.S. 677, 742, 99 S.Ct. 1946, 1981, 60 L.Ed.2d 560 (1979) (Powell, J., dissenting) (the relevant question is whether "Congress absentmindedly forgot to mention an implied private right of action"). See also, *Siebert v. The Conservative Party of New York State,* 724 F.2d 334 (2d Cir.1983). While it is true that the Supreme Court has backslid on one or two such cases recently, notably *Merrill Lynch, etc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) and *Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), *Siebert* makes it clear that "[a] lower federal court ... must employ the analysis currently required by the Supreme Court for making the determination of Congressional intent" (At 337).

Applying such considerations, this Court concludes that Congress intended no private right of action for a violation of § 404.

To begin our analysis, we note that Century is not an intended beneficiary of § 404. As an air freight forwarder, it is itself a regulated entity under the statute, and therefore cannot claim any "especial benefit." The purpose of the Federal Aviation Act has been defined to be "the protection of the traveling public." *Carceres Agency, Inc. v. Trans World Airways, Inc.,* 594 F.2d 932 (2d Cir.1979) [travel agent not a beneficiary under § 404(b)]. Air freight forwarders, like travel agents, are members of the air transportation industry who arrange for and purchase air transportation for the benefit of the public at large.

In *Carceres, supra,* the Court of Appeals observed that there is no indication in the legislative history of § 404(b) that Congress intended to give travel agents a right of action. 594 F.2d at 933–34. Indeed, there is nothing in the legislative history of either § 404(a) or § 404(b) indicating Congressional intent to give *any* private party a right of action. See 1958 U.S.Code Cong. & Adm.News 3741–72. Furthermore, a companion provision of the Federal Aviation Act, 49 U.S.C. § 1487(a) authorizes a private action in the district court to enforce 49 U.S.C. § 1371(a), which prohibits persons from engaging in air transportation without a CAB certificate. The only other enforcement provision of the Act, 49 U.S.C. § 1487(b), authorizes the CAB or the FAA to initiate proceedings for violations of the Act.

Because Congress has specifically authorized these remedies, an inference follows that there was no Congressional intent to have this Court imply additional remedies. This Court should not alter the legislative design with remedies of its own choosing absent an indication of an intention by Congress that we should do so. *Carceres, supra,* 594 F.2d at 933; *Siebert, supra.*

Also, there has been no showing that the implication of a private right of action in this instance would be consistent with the underlying legislative scheme of the Federal Aviation Act, and I believe it would not be. Damage actions do not inevitably com-

plement the work with which the federal regulatory agencies have been charged by Congress. Indeed, in the context of allegations of economic discrimination or unfair trade practices, the necessary inquiry involving economic and policy considerations is often better suited to resolution by the administrative experts of the agency charged with the supervision of the industry than by the results of many disparate civil lawsuits randomly brought, and just as often randomly decided by different courts throughout the nation.

The absence of any strong need for an implied judicial remedy of damages is also demonstrated by the fact that the CAB has already addressed the issues raised by Century, and American has signed a consent order resolving the question of future air cargo space allocations. A damage action is clearly not necessary to further the purposes of the Act, nor is there any reason to believe it was intended by Congress.

Finally, although the existence of a state common law remedy is said to be irrelevant when other parts of the *Cort* test have not been satisfied, *Touche Ross & Co. v. Redington, supra,* 442 U.S. at 575–76, 99 S.Ct. at 2489, it should be noted that Century, unlike the travel agent in *Carceres,* has no damage action under state law.

Accordingly, plaintiff's motion for a partial summary judgment with respect to its § 404 claim is denied, and defendant's motion to dismiss the claim is granted because this Court concludes as a matter of law that no implied right of action exists for the claimed violations.

*Claim Under § 1 of the Sherman Act*

Century contends that American and PBA conspired to exclude it from Flight 841 in violation of § 1 of the Sherman Act. (Complaint, ¶ 30; Plaintiff's Memorandum at 1). American contends that its motion for summary judgment against Century should be granted on this claim because plaintiff has failed to produce significant probative evidence that American and PBA combined or conspired to prevent access by Century to Flight 841, and because that flight is not the relevant market.

Under § 1 of the Sherman Act, Century has the burden of proving that (1) there was concerted activity by American and PBA to exclude Century from Flight 841; and (2) that this concerted activity resulted in an unreasonable restraint of trade in the relevant market. *National Auto Brokers Corp. v. General Motors Corp.,* 572 F.2d 953, 960 (2d Cir.1978), *cert. denied,* 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 38 (1979).

In its complaint, Century does allege an agreement between American and PBA, and the affidavits and affirmations submitted on this motion present the following evidence in support: (1) that PBA was the beneficiary of American's refusal to provide Century with reserved container positions on Flight 841 (Cirami Affidavit, ¶ 18); Affirmation of Milton Horowitz, Esq., sworn to July 4, 1983, ¶ 9 ("Horowitz Affirmation"); (2) that at a prior point in time, PBA informed the CAB that Century would be an "undesirable element" in the air freight forwarding business (Cirami Affidavit, ¶ 18); (Horowitz Affirmation, ¶ 9); (3) that American's failure to accord Century with reserved container positions was motivated by fear of losing PBA as a customer (Cirami Affidavit, ¶ 18); (4) that American and PBA had frequent meetings at which Flight 841 was discussed (Horowitz Affirmation, ¶ 9).

■ The proffered evidence, if believed, is insufficient to establish an unlawful conspiracy between American and PBA. While it is of course true that "[i]llegal conspiracies ... can rarely be proved through evidence of explicit agreement, but must generally be proved through inferences from the conduct of the alleged conspirators," *Venture Technology, Inc. v. National Fuel Gas Co.,* 685 F.2d 41, 45 (2d Cir.), *cert. denied,* 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982), the plaintiff must nonetheless present evidence of "qualitative value in demonstrating that the parties actually entered into a conspiracy." *Id.* at 48. A showing of close relationships between the alleged conspirators,

or frequent meetings between them, without more, will not sustain the plaintiff's burden. *Oreck v. Whirlpool Corp.,* 639 F.2d 75, 79 (en banc) (2d Cir.1980), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981). Moreover, a mere showing that a customer such as PBA had the economic power to affect a supplier, here American, in its dealings with another customer such as Century, does not constitute sufficient circumstantial evidence of an unlawful agreement or conspiracy. *Id.* Nor do the complaints of another customer about the plaintiff's character, even when followed by a subsequent refusal to deal, serve as the basis for inferring concerted activity, absent other evidence of an understanding between the alleged conspirators. See *Moore Drug Exchange v. Eli Lilly & Co.,* 662 F.2d 935, 941 (2d Cir.1981), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982).

In the instant case, although it is undisputed that the principal of PBA did send a letter to the CAB critical of Century, there is no evidence suggesting that this was anything more than the unilateral act of PBA, which is not a party to this action. Moreover, that correspondence was written more than a year before American commenced Flight 841. (Cirami Affidavit, ¶ 12).

As to American's considerations of PBA's likely reaction if it decreased PBA's space allocation in favor of Century, American has admitted that it did not wish to risk the loss of its major customer on the flight. (Shipman Affidavit, ¶ 20). This admission, however, does not point inevitably in the direction of a *conspiracy,* rather it supports equally the innocent inference that American was engaged in exercising reasonable and independent business judgment for its own best interests in a competitive market. Finally, the meetings referred to between American and PBA, (Horowitz Affirmation, ¶ 9) indicate nothing more sinister than that PBA complained about American's rates and service. There is no reference to the exclusion of Century, or any other competitor for that matter. Indeed, it is doubtful whether a few such meetings over the course of a decade could even be viewed as "close relations" between the two companies.

Furthermore, Century has failed to establish that the space allocation system adopted by American had an illegal purpose or effect.

In its supporting memorandum, Century seeks to establish a violation of § 1 on the basis of two distinct theories. First, it invokes the "essential facility" doctrine, by arguing that American's allocation was illegal "given the utter domination in the relevant market of the southbound New York to San Juan air freight traffic." (Plaintiff's Memorandum at 2). Second, a fair reading of plaintiff's papers indicates that it also seeks to urge a § 1 violation on the grounds that American and PBA engaged in an illegal group boycott. *Id.*

■ The "essential facility" doctrine has four elements: (1) existence of a facility whose use is essential to entry into the relevant market; (2) a facility that for all practical purposes cannot be duplicated; (3) access to the facility could be made to the party seeking entry without interfering with its competitor's use of the facility; (4) an agreement between the owner of the facility and the potential entrant's competitor which prevents an equitable sharing of the facility. See *Hecht v. Pro-Football, Inc.* 570 F.2d 982, 992–93 (D.C.Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978).

■ It is true that the allocation system adopted by American did prevent an equitable sharing of the space onboard Flight 841, because the reserved space was frozen for all time after the initial allocation was made in 1971. However, Century has not established, nor can it do so, that access to Flight 841 was essential for entry into the relevant market or that the service provided by American could not be duplicated.

Each of these elements of the "essential facility" doctrine depends upon an appropriate definition of the relevant market. Century contends, but the evidence does

not support, that the relevant market is a very narrow one: direct, regularly scheduled, nightly, all-freight, air carriage of goods between New York City and San Juan, Puerto Rico. This definition, in effect, defines the relevant market as American's Flight 841. However, in defining what is the relevant market, this Court must consider, based upon the facts disclosed in the record, what services or facilities are "reasonably interchangeable by consumers for the same purposes." *United States v. duPont (Cellophane)*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007–08, 100 L.Ed. 1264 (1956).

This Court finds that the relevant market here extended at least to all air carriage of goods between New York and any airport in Puerto Rico. The record indicates that in addition to charter service, a variety of regularly scheduled flights were available. In particular, it is undisputed that at least two direct flights, Eastern Airlines passenger/freight combination Flight 929 and American's passenger/freight combination Flight 697 left New York at about the same time as Flight 841. (Cirami Reply Affidavit, ¶¶ 21–22; Shipman Affidavit, Ex. A). In addition, throughout the time period covering the dispute, several early morning, afternoon and early evening flights were available, as were indirect flights via Miami and Atlanta. (Shipman Affidavit, Ex. A).

This Court rejects, as unreasonable, Century's contention that the combination flights should be excluded from the relevant market, because the "LD-3" type containers used on them were only one-third the size of the "A" type containers used on Flight 841, and similarly finds that the alleged "inconvenience" of the early morning, early evening and indirect flights is insignificant in determining the relevant market.

All of the aforementioned flights are reasonably interchangeable with Flight 841, within the context of the shipment of goods by air between New York and Puerto Rico. Indeed, given the flexibility afforded by trucking, the relevant market might be much larger, encompassing air transportation of goods to Puerto Rico from other airports in the mid-Atlantic region near enough to New York to be reached by motor truck without passing through the congested highways which serve New York City.

Century's second argument in support of its assertion of a § 1 violation is that American and PBA engaged in an unlawful boycott. This suggests a simple vertical restraint, and as such must be analyzed under a rule of reason. See *Oreck Corp. v. Whirlpool Corp., supra* at 131. This is not a situation where it has been alleged that a group of plaintiff's competitors have conspired with several suppliers of a good or service to exclude the plaintiff. See *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212–13, 79 S.Ct. 705, 709–10, 3 L.Ed.2d 741 (1959). For Century to show that the restraint was unreasonable, this Court must be presented with evidence of

"the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts." *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243–44, 62 L.Ed. 683 (1918).

Century has offered no evidence whatsoever regarding harm to the air freight forwarding business as a result of American's space allocation system, nor has it adduced evidence concerning the history and conditions in the relevant sector of that business.

It is, of course, true that a motion for summary judgment may not be granted to defendant herein unless, after resolving all of the ambiguities and drawing all of the inferences in favor of the party against whom summary judgment is sought, that there remain no material facts in dispute. The burden "is on the moving party to establish that no relevant facts are

in dispute." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444 (2d Cir.1980). This Court also observes that ordinarily summary judgment is not entered against a party until that party has had an opportunity to engage in discovery. See *Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co.*, 513 F.2d 102, 109–10 (2d Cir.1975). However, in the instant case, plaintiff, who also seeks summary judgment, has alleged that the facts set forth in its motion establish American's liability, and that any further discovery would constitute a "sheer waste." Defendant, under these circumstances, need not be burdened with a round of discovery that plaintiff itself concedes would be wasteful. See *Contemporary Mission, Inc. v. U.S. Postal Service*, 648 F.2d 97, 105 (2d Cir. 1981).

 Defendant has demonstrated that the facts upon which Century has relied to establish allegations of a § 1 violation are not susceptible of the interpretation plaintiff sought to give them: insufficient facts have been adduced to establish a conspiracy between American and PBA; the "relevant market" definition proffered by Century is inherently unrealistic and unreasonable; the evidence of an illegal boycott is utterly lacking. This failure of proof on the part of plaintiff, coupled with plaintiff's disclaimer of any need for further discovery, justifies entry of summary judgment against it. As the Court of Appeals noted in *Modern Home Institute, supra,* once the defendant has shown " 'that the facts upon which [plaintiff] relied to support [its] allegation were not susceptible of the interpretation [it] sought to give them' [plaintiff is] obligated by Rule 56(e), F.R. Civ.P., to offer evidence supporting the inferences urged by [it] or else face summary judgment dismissing [its] complaint," 513 F.2d at 109, *quoting from First National Bank v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968).

In addition, the record indicates that American has made an affirmative showing, and this Court finds, that: (1) its failure to accord Century reserved air space was an independent business decision (Shipman Affidavit, ¶ 25); (2) that it was unaware at the time of PBA's prior communication with the CAB about Century's license, and that PBA never told any officer or employee of American not to deal with Century (Shipman Affidavit, ¶ 25); (3) that the relevant market in the instant action, as this Court has found previously, consisted at the very least of all air carriage of goods between New York and Puerto Rico (Shipman Affidavit, ¶ 23 and Ex. A); (4) that American could not have granted Century reserved air space without the loss of PBA's business (Shipman Affidavit, ¶ 19); (5) that this loss would have jeopardized the continued existence of Flight 841, in light of the high volume of freight shipped by PBA on the return flight, an advantage not offered by others (Shipman Affidavit, ¶ 24); and (6) that competition was not harmed by American's failure to accord Century reserved air space at the expense of others (Shipman Affidavit, Ex. A).

Century's motion for summary judgment with respect to its claim under § 1 of the Sherman Act is denied.

American's motion for summary judgment against Century on the § 1 claim is granted.

*Claim Under § 2 of the Sherman Act*

 Century also contends that American's conduct in denying it reserved main deck container positions on Flight 841 constitutes attempted monopolization as defined by § 2 of the Sherman Act. In order to prevail on this claim, Century must establish that American (1) had monopoly power in the relevant market; and (2) willfully maintained that monopoly. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966).

 Century has failed to meet its burden in establishing that American had monopoly power in the relevant market, because it has failed to present credible evidence that the relevant market is defined as it claims. As stated previously, this

Court finds that the relevant market is at the least inclusive of all air carriage of goods between New York and Puerto Rico. Therefore, Century's assertion that American had a 75% share of the market, is, if the two late night combination passenger/freight flights of American and Eastern Airlines are taken into account (Cirami Reply Affidavit, ¶ 21), unsupportable. This Court makes no specific finding as to the percentage of the relevant market that was accounted for by American's Flight 841, however, the evidence adduced by American (Shipman Affidavit, Ex. A), as to the number of alternative flights, scheduled and charter, available to air freight forwarders indicates clearly that American did not have the "power to control prices or exclude competition." *United States v. duPont, supra,* 351 U.S. at 391, 76 S.Ct. at 1005.

■ Century has also failed to present any credible evidence demonstrating that American wilfully attempted to maintain any market power it had in the carriage of goods by air between New York and San Juan. The only evidence offered by Century is that American failed to provide Century with reserved main deck container positions on Flight 841. It is indeed difficult to fathom how the identity of the customers on this flight could help to maintain American's position in the market or prevent entry and competition from other scheduled airlines or chartered flights. Nor can Century show that American somehow used its position in the market to eliminate its competitors. The undisputed evidence, (Shipman Affidavit, Ex. A), does not show any noticeable decline in the number of flights, nor the number of direct air carriers offering flights to Puerto Rico from New York during the period of this dispute. Moreover, by its own admission (Cirami Affidavit, ¶ 12), Century concedes that the reason there was no other late night all freight flight, between New York and San Juan at the time, was that demand, especially on the return flight, was insufficient to support a rival service.

Defendant has established that the facts presented by Century cannot support an actionable claim under § 2, and Century has not adduced any evidence which would militate against entry of summary judgment against it. As noted earlier, defendant has established affirmatively that: (1) the relevant market is at the very least inclusive of all air carriage of goods between New York and Puerto Rico; (2) American lacked the power to control prices or exclude competition in this market; (3) American did not further its position in this market wrongfully by failing to allocate reserved air space to Century; (4) American's conduct did not demonstrably reduce competition in the relevant market; and (5) that Flight 841 was the only nightly, all freight flight was attributable solely to inadequate market demand, especially on the return flight.

Accordingly, Century's motion for partial summary judgment with respect to its § 2 claim is denied and the motion of defendant is granted.

*Conclusion*

In summary, plaintiff's motion for partial summary judgment is denied in all respects. Defendant's motion to dismiss the complaint pursuant to Rule 12(b)(6), F.R. Civ.P., with respect to the claim under § 404 of the Federal Aviation Act is granted. Defendant's motion for summary judgment against plaintiff as to the claims under Sections 1 and 2 of the Sherman Act, pursuant to Rule 56, F.R.Civ.P., is granted.

The Clerk of the Court shall enter final judgment that all relief is denied. See Rule 58 F.R.Civ.P.

So Ordered.